**DEERE & COMPANY, Plaintiff,**

v.

**MTD PRODUCTS, INC., Defendant.**

**No. 94 Civ. 2322 (LMM).**

United States District Court,
S.D. New York.

July 27, 1994.

Supplemental Findings of Fact,
Conclusions of Law, and Order
Aug. 11, 1994.

**114**

Arthur J. Ginsburg (David Y. Atlas, Richard Kurnit, of counsel), Frankfurt, Garbus, Klein & Selz, New York City, for plaintiff Deere & Co.

Patricia Hatry, Davis & Gilbert, New York City, for defendant MTD Products, Inc.

### FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

McKENNA, District Judge.

Plaintiff Deere & Company ("Deere") initiated this action by filing the Complaint, along with an Order to Show Cause seeking a Preliminary Injunction and a Temporary Restraining Order, on April 1, 1994. Plaintiff alleges that the actions of Defendant MTD Products, Inc. ("MTD"), in broadcasting or causing to be broadcast the television commercial at issue, violate Section 43 of the Lanham Act, 15 U.S.C. § 1125(a), and the New York anti-dilution law, N.Y.Gen.Bus. Law Art. 24 § 368–d (McKinney 1984), and constitute unfair competition and unjust enrichment under the common law of New York. Plaintiff contends that the jurisdiction of the Court arises because the litigation raises a question under federal law (specifically the Lanham Act, 15 U.S.C. § 1051 *et seq.*), because there is diversity of citizenship of the parties and the amount in controversy is greater than $50,000, and on the basis of supplemental jurisdiction. *See* 15 U.S.C. § 1121, and 28 U.S.C. §§ 1331, 1332, 1338(a), (b), and 1367(a). After a hearing held on

April 1, 1994, the Court denied Plaintiff's application for a Temporary Restraining Order. On April 21 and 22, 1994, a hearing was held on the Order to Show Cause for a Preliminary Injunction.[1]

For the reasons set forth below, Plaintiff's application for a preliminary injunction is granted.

### I.

#### A.

Plaintiff Deere is a Delaware corporation with its principal place of business in Illinois. For more than 150 years, Deere has been in the agricultural equipment industry, and is nationally and internationally famous for both its agricultural equipment and its lawn and grounds care products. Deere has used a leaping male deer design as a trademark for identifying its products and services for over one hundred years. Since 1968, the current version of the leaping male deer logo (the "Deere Logo") has been used in some form on or in connection with substantially all of its products and services, as well as in advertisements and promotional material for those goods and services. Deere is the owner of numerous trademark registrations both in the United States and throughout the world for different versions of the Deere Logo; the versions vary in numerous respects, including the use or absence of a border or frame and the use or absence of the name "John Deere." What the trademarks have in common is the substantially identical, static, two-dimensional silhouette of a leaping male deer in profile, facing to the viewer's left. *See* Nolan Aff., Mar. 31, 1994 ("Nolan Aff. I"), Exs. A–B; Nolan Aff., Apr. 11, 1994 ("Nolan Aff. II"), Exs. E–W.

Deere's net sales of equipment bearing the Deere Logo for the fiscal year ending October 31, 1993, exceeded $6.4 billion, of which more than $4.4 billion were in the United

---

1. At the close of the April 1, 1994, hearing, the Court instructed the parties to submit to the Court in writing the direct testimony of any witnesses they wished to call. *See* Transcript of Hearing on Application for Temporary Restraining Order, Apr. 1, 1994 ("TRO Hr'g Tr."), at 38–

39. Certain exceptions to this directive later were approved by the Court. Nevertheless, the hearing consisted mainly of cross-examination, redirect, and recross of witnesses, as well as legal arguments by counsel.

States.[2] In each of the fiscal years 1992 and 1993, Deere spent more than $40 million advertising its agricultural, industrial, and lawn and grounds care products and services, using the Deere Logo, in the United States. Deere has budgeted a similar amount for the same purpose for fiscal year 1994.[3] In addition, Deere has spent a substantial amount of money in advertising and promoting its products, using the Deere Logo, outside the United States.

The Deere Logo has been an important part of Deere's marketing efforts for more than 100 years. Plaintiff maintains that the Deere Logo is "one of the most recognizable logos in the world," Wood Aff. ¶ 4. Through its widespread use, the Deere Logo has, according to Plaintiff, "achieved a secondary meaning in the marketplace," and has "become [a] business asset[ ] of immense value to Deere and represent[s] substantial goodwill to Deere." Compl. ¶¶ 13, 14; *accord* Pl.'s Reply Br. Further Supp.Mot.Prelim.Inj. at 11 ("[Deere's] leaping deer logo is enormously distinctive and enjoys extraordinary secondary meaning by virtue of its use in connection with various goods and services for more than 100 years."). Plaintiff considered and rejected the idea of animating the Deere Logo, Harries Aff. ¶ 5, and has never given anyone else permission to animate it.

### B.

Defendant MTD is an Ohio corporation with its principal place of business in Ohio. MTD manufactures, *inter alia,* lawn tractors and mowers. The instant action revolves around a commercial advertising MTD lawn tractors—specifically, the Yard–Man lawn tractor line—produced for MTD by W.B. Doner & Company ("Doner"), which, at the time this action was commenced, had served as MTD's advertising agency for three years. At the April 1, 1994, hearing, Defendant presented a revised version of the original commercial with two significant changes: 1) the addition of visual text superimposed be-

low the version of the Deere Logo used in the commercial that reads "This is a trademark of John Deere and not affiliated with Yard–Man", *see* Facsimile Copy of Storyboard ("Storyboard"), Def.'s Ex. O; and 2) a change in the voice-over, so that what was heard in the original version—"[The Yard–Man] doesn't run for nearly as much money"—was changed to "[The Yard–Man] doesn't cost nearly as much money." *See* Videotape of Updated and Original Versions of Commercial ("Videotape"), Pl.'s Ex. 39; *see also* TRO Hr'g Tr. 33–34. The Court's denial of Plaintiff's request for a Temporary Restraining Order, entered at the April 1, 1994, hearing, was made with the understanding that from that point forward only the revised version of the commercial would be broadcast. *See* TRO Hr'g, at 40. It is this revised version of the commercial (the "Commercial") that is at issue in this action.

The Commercial had its genesis in a November 9, 1993, memorandum from David DeMuth, Vice President and Management Supervisor of Doner in charge of the MTD account, to John Parlato, Creative Director at Doner. DeMuth asked Parlato to oversee development of a commercial comparing the Yard–Man line of lawn tractors to a more expensive but otherwise comparable brand of tractor; DeMuth specifically suggested that the comparison be made to Deere lawn tractors. *See* Mem. from David DeMuth to John Parlato, Nov. 9, 1993, DeMuth Aff.Ex. A. At some point in the evolution from a general suggestion to a more defined commercial concept, the idea of animating the Deere Logo was born. On several occasions, DeMuth and another Doner employee, one L. Wickenden, solicited the opinion of Bryan Yolles, Executive Vice President, General Counsel, and Chief Administrative Officer of Doner, as to the legality of such a commercial. *See, e.g.,* Mem. from L. Wickenden to Bryan Yolles, Oct. 28, 1993, Pl.'s Ex. 14 (expressing concern about possibly "disparaging the competition"; at the bottom of the letter, which asked Yolles to review the pro-

---

2. Deere contends, moreover, that revenues from its financial services and insurance operations, which also utilize the Deere Logo, exceeded $1.1 billion in fiscal year 1993.

3. Deere has also invested an unspecified sum in advertising its parts and merchandise, such as oil and clothing items, as well as its financial and insurance services using the Deere Logo. *See* Nolan Aff. I at 3.

posed storyboard and script for the commercial, is the following handwritten note: "approved Bryan Jay Yolles 29 Oct. 1993"); Mem. from David DeMuth to Bryan Yolles, Undated, Pl.'s Ex. 23 (asking for review of storyboard and referencing previous conversations on the issue of whether to use the actual Deere Logo or an altered version of it, and indicating that DeMuth would follow up with Yolles by telephone); Mem. from Bryan Yolles to David DeMuth, Jan. 7, 1994, Pl.'s Ex. 16 (approving the "use [of] the actual John Deere Logo as long as [the commercial] indicate[s] that the logo is a registered trademark of The John Deere Company [*sic*].""). Yolles ultimately approved the commercial based on the storyboard, the script, and his discussions with DeMuth, because Yolles believed it was permissible to animate a competitor's logo. *See* Yolles Test., Transcript of April 21 and 22, 1994, Preliminary Injunction Hearing ("PI Hr'g Tr.") at 75–77.

Despite Yolles admonition to "use the actual John Deere Logo," Mem. from Bryan Yolles to David DeMuth, Jan. 7, 1994, Pl.'s Ex. 16, Doner concededly altered the static logo actually found on Deere tractors for use in the Commercial. In addition to the inserting the registered trademark symbol in the bottom right-hand corner outside the logo, a change—if it can be called that—which Yolles himself suggested, Doner removed "John Deere" from the version of the Deere Logo used by Deere on the front of its lawn tractors, a change Yolles concedes that he approved, *see* PI Hr'g Tr. 85; *see also* Mem. from David DeMuth to John Parlato/Judy Wittenberg, Dec. 16, 1993, Pl.'s Ex. 24 (describing need to alter version of the Deere Logo found on its lawn tractors because that version "has the words 'John Deere' beneath the symbol."), and changed the shape of the boundary (making it more sharply rectangular than the actual Deere Logo). *See* Nolan Aff. II at 2. Plaintiff also contends that "the leaping deer design in the commercial appears to be a somewhat distorted version of Deere's leaping deer design trademark even before the deer design is animated in the

commercial." *Id.* The Court agrees that the deer in the Commercial appears to be somewhat differently proportioned, particularly with respect to its width, than the deer in the Deere Logo. *Compare* Storyboard, Def.'s Ex. O *with* Nolan Aff. II Ex. I.[4] In addition, of course, the animation of the static Deere logo—a detailed description of which follows—alters the static logo, at least to the extent that (considering the Commercial from a frame-by-frame perspective) the Commercial places the deer in myriad poses different from the pose it strikes in the Deere Logo. Of greater significance and concern to Plaintiff is the fact that the deer is made to *move* —to look behind it, to run, to jump, to change direction—something the *static* Deere Logo obviously (and by definition) does not do.

A description of the completed version of the Commercial (including the revisions incorporated just prior to the April 1, 1994, hearing) follows. The Commercial begins with a full, front-on shot of a John Deere lawn tractor; on the front of the tractor is the Commercial Logo.[5] The next shot is a full screen close-up of the Commercial Logo; in the lower right-hand corner of the Commercial Logo, outside the border, is the symbol indicating a registered trademark (a capital "R" with a circle around it); below the Commercial Logo is the text: "This is a trademark of John Deere and not affiliated with Yard–Man". *See* Storyboard, Def.'s Ex. O; Videotape, Pl.'s Ex. 39. The voice-over that accompanies the first three cuts of the Commercial states: "A very expensive maker of lawn tractors likes to say 'nothing runs like 'em.'" *See* Storyboard, Def.'s Ex. O; Videotape, Pl.'s Ex. 39. This is an obvious reference to the Deere slogan "NOTHING RUNS LIKE A DEERE", which is a registered trademark of Deere. *See* Nolan Aff. I Ex. C. After a number of live action shots of the Yard–Man tractor cutting a lawn, accompanied by a voice-over description of some of the tractor's features, another close-up of the Commercial Logo appears—this time without

---

**4.** The Court will hereinafter refer to this altered version of the Deere Logo as the "Commercial Logo."

**5.** *See supra* for a description of how the Commercial Logo differs from the version of the Deere Logo actually found on the front of Deere's lawn tractors.

the registered trademark symbol in the lower right-hand corner. The deer inside the Commercial Logo springs to life through animation, turning its head toward the viewer in order to look behind it (to the viewer's right)—presumably to see the Yard–Man tractor bearing down on it. The deer turns and faces forward again (to the viewer's left), lowers its head, and jumps forward (again to the viewer's left) through the left vertical border of the Commercial Logo, which breaks into pieces and tumbles toward the ground. The deer lands in a live action shot of the lawn, and continues throughout the Commercial to be superimposed onto live action footage. The deer begins to run with the tractor in pursuit. A close-up shot of the tractor is accompanied by the voice-over: "So it runs like a you-know-who. Only it doesn't cost nearly as much money." *See* Storyboard, Def.'s Ex. O; Videotape, Pl.'s Ex. 39. The deer, still moving from right to left, runs past a leashed dog; the dog is of a breed which, although unspecified in the record, is recognizable as being a breed that is short in stature. The dog barks or snaps at the deer, which changes direction and runs away from the dog; the deer continues to move from right to left, but in a way that makes it appear as if the deer is moving toward the viewer before it disappears into the lower left-hand corner of the screen. After a shot of a stationary Yard–Man tractor flanked by two Yard–Man lawn mowers, with a voice-over that states "Yard–Man. American Made. American Owned.",[6] there is a final shot of the deer, now dwarfed by the Yard–Man tractor, running left to right with the Yard–Man tractor in pursuit.

The Commercial was submitted to ABC, NBC, and CBS for clearance by the legal staffs of those networks prior to their running it. All three networks sought and received substantiation of the claims made in the Commercial; Defendant has provided copies of the substantiation it submitted in support of the Commercial. *See* DeMuth Aff.Exs. D–1, D–2, and D–3.[7] NBC approved the Commercial outright. ABC approved the Commercial with the following handwritten proviso: "Please be reminded ABC has the right to re-evaluate this commercial should there be [a] responsible complaint." *See* DeMuth Aff.Ex. D–1. CBS approved the Commercial after demanding and receiving a letter of indemnity from Doner, even though, according to Defendant, it is standard practice for a buyer of media time contractually to indemnify the network, and therefore, Doner already had indemnified CBS. *See, e.g.,* Yolles Test., PI Hr'g Tr. 89–92.

The Commercial was scheduled to run, and presumably did run, during sports programs on major network, spot market, and cable television from the week of March 7, 1994, through the week of May 23, 1994. *See* Yard–Man '94 Spring Advertising Schedule, Def.'s Ex. Y. On March 27, 1994, John M. Nolan, Senior Patent Counsel for Deere, viewed a broadcast of the original version of the Commercial on WHBF–TV, a television station broadcasting from Rock Island, Illi-

---

**6.** Plaintiff originally protested the use of this copy in the Commercial, reasoning that such a statement implied that Deere and Deere products were not also American made and American owned. Plaintiff did not press this claim with much vigor at the April 21 and 22, 1994, hearing, perhaps because Defendant presented evidence that MTD requires that the slogan "American Made American Owned" (or some version of such) appear in all its advertising and promotional material. *See, e.g.,* DeMuth Aff. ¶ 2; Yolles Aff. ¶ 6.

**7.** Representative of the substantiation is a letter provided by DeMuth to NBC, in which DeMuth relies on the March/April 1994 issue of Consumer Reports to support the claim of comparable quality at a lower price. DeMuth, referring to the Consumer Reports study, suggests that the price range for Yard–Man Lawn and Garden Tractors is $1,300 to $5,000, while similar Deere models are priced at $1,999 to $8,599. Specifically, DeMuth points out that the Yard–Man D694G lawn tractor, which features a 15 horsepower engine as well as a hydrostatic transmission and a mulch kit, retails between $1,499 and $1,599, while the Deere STX38, which has a 12.5 horsepower engine, a gear drive transmission (which, apparently, is less desirable than a hydrostatic transmission), and which does not have a mulch kit, retails for a minimum of $1,999. *See* Letter from David DeMuth to Dorothy Busz, Mar. 10, 1994 (with an attached copy of Letter from David DeMuth to Dorothy Busz, Mar. 2, 1994, containing handwritten comments apparently made by Busz), Def.'s Ex. U; *see also* Def.'s Exs. V, W.

nois that is associated with CBS.[8] After a flurry of communication between Plaintiff's counsel and Defendant's general and outside counsels, Plaintiff commenced the instant action on April 1, 1994.

## II.

At issue is Plaintiff's application for a preliminary injunction, *inter alia*, prohibiting further airing of the Commercial. It is well established that

> [t]he standard in the Second Circuit for injunctive relief clearly calls for a showing of (a) irreparable harm and (b) either (1) likelihood of success on the merits, or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.

*Bridgeport Coalition for Fair Representation v. City of Bridgeport*, 26 F.3d 271, 274 (2d Cir.1994) (quoting *Jackson Dairy v. H.P. Hood & Sons*, 596 F.2d 70, 72 (2d Cir.1979)).

■ For reasons that will become clear, the Court limits its consideration of Plaintiff's motion for a preliminary injunction to the contention that the Commercial violates the New York anti-dilution statute. Section 368-d of Article 24 of the New York General Business Law states:

> Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

N.Y.Gen.Bus.Law Art. 24 § 368-d (McKinney 1984). As one commentator has explained:

> The dilution theory grants protection to strong, well-recognized marks even in the absence of a likelihood of confusion, if defendant's use is such as to diminish or dilute the strong identification value of the plaintiff's mark even while not confusing customers as to source, sponsorship, affiliation or connection. The underlying rationale of the dilution doctrine is that a gradual attenuation or whittling away of the value of a trademark, resulting from use by another, constitutes an invasion of the senior user's property right in its mark and gives rise to an independent commercial tort. . . . [Dilution occurs when] the ability of the senior user's mark to serve as a unique identifier of the plaintiff's goods or services is weakened because the relevant public now also associates that designation with a new and different source.

2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* ("2 McCarthy") § 24.13[1][b], at 24–107 (3d ed. 1992). The Second Circuit has addressed the requirements for maintaining a claim under Section 368-d:

> There are three elements of such a claim: (1) distinctiveness of the mark, either that the mark is truly of distinctive quality or has acquired secondary meaning in the eyes of the public; (2) likelihood of dilution, either as the result of blurring of product identification or the tarnishing of an affirmative association that a mark has come to convey; and (3) predatory intent.

*W.W.W. Pharmaceutical Co. v. Gillette Co.*, 984 F.2d 567, 576–77 (2d Cir.1993) (quotation marks and citations omitted). Settling what had been a matter of some dispute, the Second Circuit recently held that Section 368-d "is applicable to competitors as well as noncompetitors," *Nikon Inc. v. Ikon Corp.*, 987 F.2d 91, 96 (2d Cir.1993).[9]

## III.

Plaintiff has shown a likelihood of success on the merits on its anti-dilution claim and, moreover, has demonstrated it will be irrepa-

8. Nolan viewed the version of the Commercial that ran prior to the changes made in the days leading up to the April 1, 1994, hearing. *See supra.*

9. Moreover, as the plain language of Section 368-d indicates, a court need not find a likelihood of confusion in order to find for a plaintiff in a Section 368-d claim. *See also Sally Gee v. Myra Hogan, Inc.*, 699 F.2d 621, 624 (2d Cir. 1983).

rably harmed if injunctive relief is not granted.[10]

## A.

Plaintiff has shown a likelihood that it will be able to succeed in satisfying the three required elements of a dilution claim pursuant to Section 368–d.

### 1.

■ Defendant does not dispute Plaintiff's contention that the Deere Logo, in its many manifestations, satisfies the distinctiveness requirement outlined in *Gillette.* The Court finds that because the Deere Logo is the kind of strong and distinctive mark that is capable of dilution, and because it has acquired the requisite secondary meaning in the marketplace, *see Mead Data Central, Inc. v. Toyota Motor Sales, U.S.A., Inc.,* 875 F.2d 1026, 1030 (2d Cir.1989) (citations omitted), the Deere Logo satisfies the first element of the *Gillette* test, quoted *supra.*

■ The issue of likelihood of dilution is a more difficult one. Traditionally, the Second Circuit has defined dilution

> as either the blurring of a mark's product identification or the tarnishment of the affirmative associations a mark has come to convey.

*Mead,* 875 F.2d at 1031 (citing *Sally Gee,* 699 F.2d at 625 (quoting 3A R. Callman, *The Law of Unfair Competition, Trademarks and Monopolies* § 84.2, at 954–55)).

> The interest protected by § 368–d is not simply commercial goodwill, but the selling power that a distinctive mark or name with favorable associations has engendered for a product in the mind of the consuming public.

*Sally Gee,* 699 F.2d at 624–25 (citations omitted). In an attempt to identify the harm the statute is meant to prevent, the majority in *Mead* referred to the brief legislative history of the statute, which suggests that the purpose of the statute is to prevent

> "the whittling away of an established trademark's selling power and value through its unauthorized use by others upon dissimilar products." The [legislative] history disclose[s] a need for legislation to prevent such "hypothetical anomalies" as "DuPont shoes, Buick aspirin tablets, Schlitz varnish, Kodak pianos, Bulova gowns, and so forth", and ·cite[s] cases involving similarly famous marks[.]

*Mead,* 875 F.2d at 1031 (quoting legislative history of Section 368–d) (citations omitted).

There has been little analysis of what precisely is meant by the "blurring of a mark's product identification." The majority opinion in *Mead,* after examining the legislative history of Section 368–d (quoted *supra*), indicated only that "some mental association" must exist between the plaintiff's and defendant's marks. *See id.* Otherwise, however, the *Mead* court did not provide guidelines for determining what constitutes blurring.[11] In a concurring opinion in *Mead,* Judge Sweet noted that "confusion in the doctrine [of blurring] has created problems," *id.* at 1035 (Sweet, J., concurring), and suggested that "[t]here is much to be gained by defining a general concept like 'blurring' more specifically." *Id.* Judge Sweet, borrowing from Judge Friendly's multi-factor balancing test for identifying confusion in the trademark infringement context (articulated in *Polaroid Corp. v. Polaroid Elecs. Corp.,* 287 F.2d 492, 495 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961)), suggested a test involving the balancing of six factors:

1) similarity of the marks

2) similarity of the products covered by the marks

3) sophistication of consumers .

4) predatory intent

5) renown of the senior mark

6) renown of the junior mark

*Mead,* 875 F.2d at 1035 (Sweet, J., concurring). The fact that Defendant uses the

---

**10.** Having so concluded, the Court need not address the other claims that are contained in the Complaint and upon which Plaintiff bases its application for a preliminary injunction.

**11.** Clearly, though, the instant action does not involve precisely the type of "hypothetical anomalies" feared by the New York legislature, since Defendant is using a slightly altered version of the Deere Logo to refer to Deere's own products.

Deere Logo to refer to Deere's own products [12] renders the first, second, fifth, and sixth factors meaningless in this context,[13] leaving only the third and fourth factors, which, alone, cannot serve as a meaningful test of whether blurring has occurred. Thus, Judge Sweet's multi-factor blurring test is not applicable to the instant facts.

As the foregoing implies, the instant case is one of first impression.[14] Trademarks are symbols—symbols of products and their origins. When a trademark is successfully employed, favorable associations accrue not only to its referent—the product or source for which the trademark stands—but also to the trademark itself. Blurring consists of the "the blurring of a mark's product identification...." *Mead,* 875 F.2d at 1031 (citing *Sally Gee,* 699 F.2d at 625 (quoting 3A R. Callman, *The Law of Unfair Competition, Trademarks and Monopolies* § 84.2, at 954–55)). To put it another way, blurring involves the dilution of the relationship *between* the symbol and the referent. Blurring is typically alleged in the trademark dilution context in one of two situations: (1) the use of an identical symbol (a mark or a name) for a different referent, which dilutes the strength of identification between the symbol and the original referent, *see Mead,* 875 F.2d

at 1031 (quoting language of legislative history of Section 368–d concerning "hypothetical anomalies," *quoted supra*); or (2) the use of a demonstrably different, yet obviously similar symbol for a different referent, which diminishes the distinctiveness of the original symbol and thus lessens its power uniquely to call to mind the original referent. *See supra* note 13 (citing cases).

The instant action presents a third situation: a competitor animates the original static symbol (the Deere Logo), without the owner's permission, and uses the animated version (the Commercial Logo) in connection with the identical referent (Deere, specifically, Deere lawn tractors) for which the original version of the symbol was used.[15] Defendant's actions have, in effect, created a second symbol—the animated Commercial Logo—for the same (aforementioned) referent. Thus, Defendant likely has diminished the strength of identification between the original symbol and its referent. The consumer may no longer associate the Deere Logo only with Deere and its products, but likely also will associate the Deere Logo with the Commercial Logo, thereby blurring the Deere Logo's product identification, *cf. Mead,* 875 F.2d at 1031, and reducing the

---

**12.** To put it more accurately, Defendant purports to use Plaintiff's own static mark, and to animate it, but in fact uses a close approximation of Plaintiff's mark in both its static and animated portrayal of that mark. *See* discussion *supra.*

**13.** An examination of the cases cited by Judge Sweet in evaluating the "similarity of the mark" factor in *Mead* brings this point into sharper focus. The cases involve either an alleged similarity in names between two products of different origin, *see, e.g. McDonald's Corp. v. McBagel's, Inc.,* 649 F.Supp. 1268, 1281 (S.D.N.Y.1986) ("McDonald's" and "McBagel's"); *Universal City Studios v. Nintendo Co.,* 746 F.2d 112 (2d Cir. 1984) ("King Kong" and "Donkey Kong"); *Tetley, Inc. v. Topps Chewing Gum, Inc.,* 556 F.Supp. 785, 794 (E.D.N.Y.1983) ("Tetley" tea bags and "Petley Flea Bags"); *Toys "R" Us, Inc. v. Canarsie Kiddie Shop, Inc.,* 559 F.Supp. 1189, 1208 (E.D.N.Y.1983) ("Toys 'R' Us" and "Kids 'r' Us"); *Textron, Inc. v. Spi–Dell Watch & Jewelry Co.,* 283 F.Supp. 920 (S.D.N.Y.), *aff'd in part, rev'd in part on other grounds,* 406 F.2d 544 (2d Cir.1968) ("SPEIDEL" and "SPI–DELL" or "SPEI–DELL"), or similarity between a character that is a trademark and a character in a television program, *see Warner Bros., Inc. v.*

*American Broadcasting Cos.,* 720 F.2d 231 (2d Cir.1983) ("Superman" and title character in "The Greatest American Hero" television show). In addition, *Mead*—itself a dispute involving the use of the names "LEXUS" and "LEXIS"—falls in the first category of cases.

**14.** Neither the parties nor the Court has found any case in which an entity animated its competitor's static logo. Indeed, Plaintiff offers evidence suggesting that this simply has never before been done. *See* Wood Aff. ¶ 2. Defendant, for its part, argues that this case is not unique because many entities have animated their static logos. *See, e.g.,* Def.'s Mem.Law Opp'n Mot.Prelim.Inj. at 5 (citing examples). However, there is a vast difference between the holder of a trademark animating its *own* static mark and a competitor animating the holder's mark without the owner's permission.

**15.** Although, as the foregoing discussion illustrates, the Commercial Logo incorporates changes to the Deere Logo—even apart from the animation of the Deere Logo—the analysis that follows rests not on these other changes, but on the fact that Defendant effectively animates the static Deere Logo.

commercial goodwill and selling power of the Deere Logo.[16] In addition, to the extent the sight or mention of a Deere product triggers in the consumer the image of the Deere Logo,[17] and all the favorable associations accruing to it, there is less likelihood of such a seamless identification between Deere products and the Deere Logo, since such a mention or sighting may now trigger the image of the animated Commercial Logo instead or as well.[18]

One other point bears mentioning. It being well-established that a trademark owner does not retain exclusive control over the use of his trademark,[19] it nevertheless seems equally clear, if less prominent in the case law applying the anti-dilution statute, that the holder of a trademark retains the right to prevent others from altering its static mark by animating it in order to win some competitive advantage for themselves. This point rests less on the concept of blurring *per se* than on the motivating principle behind Section 368–d: to protect against the usurpation of the commercial goodwill, selling power, and favorable associations embodied in the trademark, which rightfully belong to the mark's owner. As one commentator has put it,

> [t]he underlying rationale of the dilution doctrine is that a gradual attenuation or whittling away of the value of a trademark, resulting from use by another, constitutes an invasion of the senior user's property right. . . .

*Id.* § 24.13[1][b], at 24–107. To permit a competitor to derive benefit from animating another's static logo is to permit the competitor to whittle away the value or usurp the fruits of the trademark. Such is a harm Section 368–d seeks to prevent.

To summarize, because a competitor's animation of a static trademark, without the owner's permission, blurs the mark's product identification and, moreover, because such action contravenes the protective purpose behind Section 368–d, such action constitutes a *per se* violation of New York's anti-dilution statute. Plaintiff, therefore, has demonstrated a likelihood of success in showing that the Commercial is likely to dilute Plaintiff's trademark.

### 3.

Plaintiff has demonstrated a likelihood of success in showing that Defendant had the requisite predatory intent. Although the language utilized by the Second Circuit in *Gillette,* quoted *supra,* appears clear, it is nevertheless not settled law in this Circuit whether a showing of predatory intent is required for, or merely relevant to, a finding that the anti-dilution statute has been violated.[20] The *Gillette* court quoted the language of the court in *Lobo Enters., Inc. v. Tunnel, Inc.,* 693 F.Supp. 71, 79 (S.D.N.Y.1988), which in turn was citing *Sally Gee,* 699 F.2d at 625–26, to the effect that predatory intent was a requirement for a showing of likelihood

16. Moreover, as Plaintiff suggests, Defendant's use of the Deere Logo is likely to blur the distinction between the Deere Logo and other deer logos used in the marketplace. *See* Pl.'s Reply Br.Supp.Mot.Prelim.Inj. at 7–8.

17. Because of the distinctiveness and strong secondary meaning of the Deere Logo, this sort of "reverse referentiality" seems likely.

18. That this constitutes blurring finds support in the statement, already quoted *supra,* that dilution occurs when

> the ability of the senior user's mark to serve as a unique identifier of the plaintiff's goods or services is weakened because the relevant public now also associates that designation with a new and different source.

2 *McCarthy* § 24.13[1][b], at 24–107.

19. As one commentator has noted,

> [i]n general, the law is that it is neither trademark infringement nor unfair competition to *truthfully* compare competing products in advertising, and in so doing, to identify by trademark, the competitor's goods.

*Id.* § 25.14, at 25–76 (citing cases).

20. If, as both the majority and concurring opinions in *Mead* imply, predatory intent is *not* a requirement for a cause of action under Section 368–d, *see Mead,* 875 F.2d at 1030 (listing distinctiveness and likelihood of dilution as only requirements for claim under Section 368–d); *id.* at 1032 (Sweet, J., concurring) (same), then the Court need not find that Plaintiff has shown a likelihood of success in showing that Defendant had predatory intent with respect to the use of the Deere Logo in the Commercial. However, because the issue is not settled, the Court will address it with respect to the instant facts.

of dilution under Section 368–d.[21] Continuing to trace the history of this requirement, the *Sally Gee* court, which, as discussed *supra* note 21, merely stated that predatory intent was a relevant factor in assessing a claim under Section 368–d, relied on a footnote in *Information Clearing House, Inc. v. Find Magazine*, 492 F.Supp. 147 (S.D.N.Y. 1980), in which Judge Weinfeld explained that

> Tarnishment is a species of dilution, which itself is a part of the broader category of unfair competition. An essential element of such a claim is proof of "unfair intent," of direct competition between the parties' respective products, or of the inferior quality of defendants' product.

*Id.* at 162 n. 44 (citing, *inter alia, G.B. Kent & Sons, Ltd. v. P. Lorillard Co.*, 114 F.Supp. 621, 630 (S.D.N.Y.1953) (Weinfeld, J.), *aff'd per curiam*, 210 F.2d 953 (2d Cir.1954)) (other citations omitted). Given this history, the predatory intent requirement may be read as a shorthand reference to the factors enumerated by Judge Weinfeld in the *Kent* footnote, and therefore, because Plaintiff and Defendant are indisputably competitors in the lawn tractor market, Plaintiff appears to have shown a likelihood of success as to this element of a dilution claim.

Even assuming, however, that the plain language of *Gillette* applies, the *Gillette* court described predatory intent as the "intent by [a junior user] to trade on [the senior user's] reputation." *Gillette*, 984 F.2d at 577 (citation omitted). That Defendant's intent from the very beginning was to elevate its own position in the marketplace by associating itself with Deere is uncontroverted.

> The primary objective of the commercial is to enhance awareness/sales for Yard–Man by positioning the brand as a superior value versus more expensive brands. We believe this can be achieved via a comparison with John Deere as Yard–Man lawn tractors posses [*sic*] all the features of a

Deere (and more in some cases) at retail prices 30%–100% less.

Mem. from David DeMuth to John Parlato, Nov. 9, 1993, DeMuth Aff.Ex. A.

### B.

Plaintiff has demonstrated that it will be irreparably harmed if the requested preliminary injunctive relief is not granted. As one court has noted:

> It would be anomalous to say that without relief plaintiff's marks would be diluted and then deny the existence of possible irreparable injury. Dilution is itself an injury which could not be recompensed by money damages.

*American Express Co. v. Vibra Approved Lab. Corp.*, No. 87–CV–8840, 1989 WL 39679, at *10 (S.D.N.Y. Apr. 19, 1989). Indeed, with respect to a party asserting a dilution claim, "it is extremely unlikely that the moving party can be fully recompensed by money damages." *Stern's Miracle–Gro Prods., Inc. v. Shark Prods., Inc.*, 823 F.Supp. 1077, 1094 (S.D.N.Y.1993). Together with the fact that Plaintiff has invested substantial sums of money in advertising campaigns featuring the Deere Logo, *see supra*, the foregoing discussion of the generally irreparable nature of the harm associated with dilution claims leads the Court to conclude that Plaintiff has made a sufficient showing that it will suffer irreparable harm as a result of Defendant's animation of the Deere Logo to warrant the requested preliminary injunctive relief.

### IV.

For the foregoing reasons, Plaintiff's application for a preliminary injunction is granted.

Plaintiff may settle, on five days' notice to Defendant, a proposed order of preliminary injunction, together with suggestions as to the amount of the bond to be furnished.

In addition, the parties will address the Court within seven days as to the time need-

---

**21.** The court in *Gillette* indicated that the language of *Lobo*, which the court quoted, was in turn a *quotation* from *Sally Gee;* in fact, the *Lobo* court was merely *citing to Sally Gee* for the proposition that predatory intent is an element of a dilution claim. This proposition is in itself something of a misnomer: the court in *Sally Gee* merely said that "the absence of predatory intent by the junior user [of a trademark] is a *relevant factor* in assessing a claim under the anti-dilution statute...." *Sally Gee*, 699 F.2d at 626 (emphasis added) (citations omitted).

ed to complete discovery and to file a pretrial order.

Counsel are to retrieve exhibits from chambers.

SO ORDERED.

### SUPPLEMENTAL FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

On July 27, 1994, the Court issued its Findings of Fact, Conclusions of Law, and Order (the "July Order") granting the application of Plaintiff Deere & Company ("Deere") for a preliminary injunction against Defendant MTD Products, Inc. ("MTD"), on the ground that in broadcasting or causing to be broadcast the television commercial (the "Commercial") at issue, MTD violated the New York anti-dilution statute, N.Y.Gen.Bus.Law Art. 24 § 368–d (McKinney 1984). The Court affirmatively declined to reach, *inter alia*, the question whether the Commercial, as Plaintiff contends, violates Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). *See* July Order at 13 n. 10. On August 9, 1994, the Court issued an Order (the "August Order") restraining and enjoining Defendant "from broadcasting, publishing, or distributing, or causing to be broadcast, published, or distributed, from, in, or into the State of New York" any material deemed to be in violation of the anti-dilution statute (as specified in the Order). *See* August Order at 2. Given that the injunctive relief granted is of a limited geographical nature, the Court now takes up the question whether the Commercial violates Section 43(a) of the Lanham Act.[1] Familiarity with the facts as recited in those two prior rulings is assumed.

The standard for preliminary injunctive relief previously having been set out, *see* July Order at 11, and the Court having already concluded that Plaintiff will be irreparably harmed if the requested preliminary injunctive relief is not granted, *see* July Order at 22–23, the Court now turns to the question whether Plaintiff demonstrated a likelihood of success on the merits of its Lanham Act claim of false and misleading advertising.[2] As the Second Circuit has noted:

> The law governing false advertising claims under the Lanham Act is well-settled in this circuit. In order to recover damages or obtain equitable relief, a plaintiff must show that either: 1) the challenged advertisement is literally false, or 2) while the advertisement is literally true it is nevertheless likely to mislead or confuse consumers.

> Where, as here, a plaintiff's theory of recovery is premised upon a claim of implied falsehood, a plaintiff must demonstrate, by extrinsic evidence, that the challenged commercial[ ] tend[s] to mislead or confuse consumers.

*Johnson & Johnson * Merck Consumer Pharmaceuticals Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 297 (2d Cir.1992) (citations omitted). Such extrinsic evidence is normally constituted by a consumer survey.[3] *See id.* at 298 ("[T]he success of a plaintiff's implied falsity claim usually turns on the persuasiveness of a consumer survey."). As the court in *Johnson* went on to explain:

> Generally, before a court can determine the truth or falsity of an advertisement's message, it must first determine what message was actually conveyed to the viewing audience. Consumer surveys supply such information. Once the meaning to the tar-

---

**1.** The Court need not address the other two claims contained in the Complaint, namely that Defendant violated the common law of unfair competition and unjust enrichment, since the same considerations that led the Court to limit the injunctive relief for the violation of the New York anti-dilution statute to activities originating or having an effect within the boundaries of the State of New York likewise would apply to injunctive relief granted pursuant to these two state common law claims.

**2.** Although Plaintiff alleges some instances of actual falsehood, the Court, upon considering all the evidence offered and all the testimony given, concludes that Plaintiff has not shown a likelihood of success on the merits of its claim that the Commercial is literally false.

**3.** Plaintiff has presented evidence that one consumer was actually confused by the advertisement. The Court is not swayed by the actual confusion of a single, otherwise unidentified individual of unknown sophistication with respect to products of the type at issue in this case.

get audience has been determined, the court ... must then judge whether the evidence establishes that they were likely to be misled.

*Id.* (citations and quotation marks omitted).

Plaintiff has not shown a likelihood of success on the merits of its claim that the Commercial is misleading or confusing. Plaintiff introduced the results of a consumer survey along with the testimony of an expert who opined that the survey results revealed a high degree of confusion among viewers as to, *inter alia,* the source of the advertisement. Defendant did not offer a survey of its own, but did provide testimony of an expert who argued that the survey results suggested that consumers, by and large, were not confused or misled by the Commercial. Having reviewed the conflicting expert testimony as well as the survey and the survey results, the Court is not persuaded that Plaintiff's interpretation of the survey results is entitled to any more weight than that advanced by Defendant. Sufficiently serious questions as to, *inter alia,* the target audience, the procedures followed by the survey-takers, and the conclusions to be drawn

from the answers to the questions have been raised to dissuade the Court from drawing definitive conclusions in favor of Plaintiff concerning Plaintiff's likelihood of success on the merits on the basis of the survey results at this juncture.[4]

SO ORDERED.

---

4. The court in *Johnson* enumerated a number of additional factors that a court may have to consider in connection with an implied falsehood claim, namely:

> 1) the general "commercial context" or sea of information in which consumers are immersed; 2) the defendant's intent to harness public misperception; 3) the defendant's prior advertising history; and 4) the sophistication of the advertising audience.

*Id.* The *Johnson* court explained, however, that the first, third, and fourth factors should only be considered after "plaintiff has established 'that a not insubstantial number of consumers' hold the false belief allegedly communicated in the ad." *Id.* (quoting *Coca-Cola Co. v. Tropicana Prods. Inc.*, 690 F.2d 312, 317 (2d Cir.1982)). The Court does not believe Plaintiff has made such a showing, but, even had the Court found otherwise, Plaintiff, as is explained more fully *infra,* is not likely to succeed in showing that any of the factors weighs against Defendant. Plaintiff has not advanced any arguments concerning the first and third enumerated factors. As to the sophistication of the advertising audience, the Court credits evidence suggesting that, because, *inter alia,* a lawn tractor is an expensive item not likely to be purchased on impulse, the target audience would be relatively sophisticated with respect to the relevant market, and not likely to be confused by the Commercial.

Turning to the question of Defendant's intent, the second enumerated factor, the court in *Johnson* indicated that

> where a plaintiff adequately demonstrates that a defendant has intentionally set out to deceive the public, and the defendant's deliberate conduct in this regard is of an egregious nature, a presumption arises that consumers are, in fact, being deceived.

*Id.* at 298–99 (citation and quotation marks omitted). Plaintiff has not shown a likelihood of success of demonstrating that MTD was seeking to harness or engender public misperception or that Defendant deliberately attempted to deceive consumers. The question of harnessing public misperception should not be confused with the issue of whether, for the purposes of determining whether there is a likelihood of dilution under the New York anti-dilution statute, Defendant had predatory intent. The Court need not revisit what it previously described at length, *see* July Order at 20–22, and notes here that the predatory intent in the dilution context, however sinister sounding, does not require a finding of bad faith, whereas harnessing public misperception implies bad faith on the part of the "harnessor." Because Plaintiff has not shown the presence of this element here, Plaintiff is not entitled to the presumption of deception.