NABISCO, INC. and Nabisco Brands
Company, Plaintiffs,

v.

PF BRANDS, INC. and Pepperidge
Farm, Inc., Defendants.

No. 99 Civ.0008 (SAS).

United States District Court,
S.D. New York.

Feb. 3, 1999.

James B. Swire, Bruce R. Ewing, Moon S. Kim, Dorsey & Whitney, L.L.P., New York, NY, for Plaintiffs.

Ethan Horwitz, Andrew Baum, Ira Jay Levy, Darby & Darby, P.C., New York, NY, for Defendants.

*OPINION AND ORDER*

SCHEINDLIN, District Judge.

## TABLE OF CONTENTS

I. Introduction ...................................................................... 192
II. History of the Dispute ........................................................... 193
III. Factual Background ............................................................. 194
 A. The Parties ................................................................. 194
 B. Product and Market Development ............................................ 194
 1. Pepperidge Farm ...................................................... 194
 2. Nabisco ............................................................... 195
IV. Applicable Legal Standard ....................................................... 196
V. Initial Threshold for Protectability of Trademarks ............................... 197
 A. Commercial Use ............................................................. 197
 B. Non–Functionality .......................................................... 197
 C. Distinctiveness ............................................................. 197
 1. Incontestability of Product Configuration Mark ....................... 198
 2. Inherently Distinctive Trade Dress ................................... 198
VI. Pepperidge Farm's Dilution Claim ................................................ 200
 A. New York General Business Law § 368–d ..................................... 200
 B. Federal Trademark Dilution Act of 1995 ..................................... 201
 1. Ownership of a Famous Mark ........................................... 202
 2. Likelihood of Dilution ............................................... 205

VII. Pepperidge Farm's Trademark Infringement Claim .......................... 210
VIII. Pepperidge Farm's New York State Unfair Competition Claim ................ 212
 IX. Conclusion ...................................................... 212

## I. Introduction

By this motion, PF Brands Inc. and Pepperidge Farm, Inc. (collectively "Pepperidge Farm") move for a preliminary injunction pursuant to Rule 65(a) of the Federal Rules of Civil Procedure ("Fed. R. Civ.P.") to prevent the alleged infringement of their registered trademarks for the Goldfish snack cracker product. Pepperidge Farm has registered a number of trademarks in Goldfish: the small, bright-orange puffed cheese crackers .that have been molded into the shape of goldfish.[1] In addition to a trademark in the Goldfish name, under which products have been sold for thirty-seven years, Pepperidge Farm also owns an incontestable configuration trademark in the fish shape of the Goldfish cracker.[2] Pepperidge Farm contends that this configuration has become closely associated in the minds of consumers with Pepperidge Farm and its cracker products and that this association is threatened by a new product of plaintiffs Nabisco, Inc. and Nabisco Brands Company (collectively "Nabisco").

Pepperidge Farm and Nabisco are active competitors in the cheese cracker snack market, with Nabisco's own cheese cracker called "Cheese Nips"—small square cheese crackers—ranking behind Pepperidge Farm's Goldfish. Pepperidge Farm recently learned that Nabisco in-tended to launch a new product on February 1, 1999 based upon the Nickelodeon Television Network's popular cartoon program titled "CatDog," which is centered around a character who is half-cat and half-dog. Nabisco's new product, also titled "CatDog" and containing the Cheese Nips trademark, is a mix of cheese crackers in three shapes: the CatDog, bones and fish. The dispute in the case centers around how children—the target consumers of Nabisco's product and approximately half the consumers of Pepperidge Farm's product—perceive this fish-shaped cheese cracker.

■ Pepperidge Farm claims that the CatDog product: (1) threatens to dilute Pepperidge Farm's configuration trademark for use of the goldfish shape for a snack cracker in violation of Section 43(c) of the Lanham Act and the New York State General Business Law anti-dilution statute; and (2) infringes that trademark in violation of Section 43(a) of the Lanham Act and common law unfair competition. Pepperidge Farm argues that Nabisco's use of a goldfish-shaped cheese cracker will dilute Pepperidge Farm's famous mark, allowing Nabisco to unfairly trade upon the good will and renown of the Pepperidge Farm Goldfish. In addition, Pepperidge Farm asserts that CatDog infringes Pepperidge Farm's trademark be-

---

**1.** Pepperidge Farm obtained the following trademark registrations on the Goldfish design and name: (1) U.S. Reg. No. 739,118 for the trademark name "Goldfish" for confections .and bakery products, namely cookies, salted biscuits, pastries and cakes, October 9, 1962; (2) U.S. Reg. No. 1,640,659 for the product design of the Goldfish cracker, April 9, 1991; (3) U.S. Reg. No. 1,804,657 for the product design of a container for crackers in the shape of a Goldfish, November 16, 1993; (4) U.S. Reg. No. 1,845,811 for· the product design of a Goldfish with a smile for cookies, July 19, 1994; (5) U.S. Reg. No. 1,869,834 for the trademark name "Goldfish" for a snack mix consisting primarily of pretzels, crackers, and nuts, December 27, 1994; (6) U.S. Reg.

No. 2,054,823 for the product design of a Goldfish with a smile for crackers and a snack mix consisting primarily of crackers, pretzels and nuts, April 22, 1997.; and (7) U.S. Reg. No. 2,176,927 for the product design of a Goldfish with sunglasses and a smile for snacks, namely crackers, July 28, 1998. *See* Index to Exhibits Submitted by Pepperidge Farm in Support of Motion for Preliminary Injunction, Exs. 1–7.

**2.** A federally registered trademark becomes "incontestable" after five years' use and compliance with statutory formalities. *See* 15 U.S.C. § 1065.

cause it will cause consumers to be confused between Goldfish and CatDog in the post-sale context.[3] Relying on evidence that adults and children frequently eat Goldfish from small plastic bags or from a bowl or plate, rather than out of the packaging, Pepperidge Farm argues that the presence of a goldfish-shaped cheese cracker in the CatDog mix will confuse consumers into believing that the product originates with Pepperidge Farm.

Nabisco asserts that it acted in good faith, modeling its product, a promotional tie-in for a television cartoon, after a character and symbols used in the cartoon. While the Court strongly supports Nabisco's right to compete with Pepperidge Farm for market share, that competition must be regulated if Nabisco attempts to compete unfairly. Pepperidge Farm may not use the trademark laws to protect itself from legitimate erosion of its market share, but it may protect itself from competition deemed to be unfair.

After reviewing the legal memoranda and affidavits submitted by the parties and conducting an evidentiary hearing on January 25, 1999, Pepperidge Farm's motion for preliminary injunctive relief is granted for the reasons set forth below.

## II. History of the Dispute

Nabisco and Nickelodeon entered into a joint promotion agreement in August 1998 to market a snack product based upon the CatDog show. Nabisco's product develop-ment team prepared a variety of designs for three shapes, to be produced as small cheese crackers, and Nickelodeon was involved in choosing the final designs, including the goldfish. *See* Declaration of Paula Brenner ("Brenner Decl."), Senior Brand Manager for Kids Brands in the Biscuit Division of Nabisco, dated January 20, 1999 at ¶ 11. The final choices were approved by Nabisco's product development group in August and by Nickelodeon in October. *Id.* at ¶¶ 9, 12.

In November of 1998, Pepperidge Farm learned that Nabisco intended to launch a CatDog product. It was able to view the product for the first time in mid-December.[4] *See* Declaration of Patrick J. Callaghan, Vice President of Marketing for Pepperidge Farm, dated January 12, 1999 ("Callaghan Decl.") at ¶¶ 20, 21. Perceiving what it describes as the "prevalence" of the fish shape in the crackers and the packaging, Pepperidge Farm sent a cease-and-desist letter to Nabisco on December 21, 1998. *See* Complaint at Ex. 3. Following receipt of this cease-and-desist letter, on January 4, 1999—five months after Nabisco's product development group approved the use of a goldfish in the CatDog mix and a little less than one month prior to the full-scale launch of the CatDog product—Nabisco filed a complaint against Pepperidge Farm, seeking a declaratory judgment pursuant to 28 U.S.C. §§ 2201 et seq. declaring that Nabisco's manufacture, advertisement, promotion and sale of "Cat-

**3.** Post-sale confusion is undoubtedly actionable. *See Lois Sportswear U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d 867, 872–73 (2d Cir. 1986) (post-sale confusion actionable where consumers would see infringing jeans on passers-by outside of the retail store and without the labels). Although Pepperidge Farm also claims point-of-sale confusion, it did not appear to press that claim at the preliminary injunction hearing. In any event, that claim is very weak, because the packaging of the two products is very different. The front of the CatDog product's eight and a half ounce rectangular cardboard carton is orange and green. It depicts a large CatDog figure around which several small drawings of the CatDog, fish and bone crackers float. The carton also contains fish and bone wallpaper and the CatDog, Nabisco, Cheese Nips and Nickelodeon trademarks. Pepperidge Farm Goldfish are sold in bags and boxes which are predominantly gold or orange on a white background with several large and small Goldfish swimming around the package. The Pepperidge Farm Farmhouse logo is displayed on each bag.

**4.** Consequently, it was not until mid-December that Pepperidge Farm realized that the CatDog product contained a goldfish-shaped cheese cracker and that the goldfish shape was displayed on the outside of the CatDog package. *See* Callaghan Decl. at ¶ 21.

Dog" cheese crackers did not infringe the Pepperidge Farm Goldfish trademark or trade dress. *See* Complaint at ¶ 5. Nabisco also seeks a declaration that Pepperidge Farm has no valid trademark rights in the goldfish-shaped product configuration.

On January 12, 1999, Pepperidge Farm answered Nabisco's complaint, alleging federal trademark infringement and dilution counterclaims, as well as injury to business reputation and dilution under New York General Business Law and common law unfair competition. *See* Answer and Counterclaims ¶¶ 48–67. Pepperidge Farm simultaneously moved by Order to Show Cause for expedited discovery and entry of a Temporary Restraining Order ("TRO") and a preliminary injunction to prevent Nabisco's CatDog product from entering the marketplace as scheduled on February 1, 1999.[5] The parties' briefs were received on January 22, 1999, and a preliminary injunction hearing was held on January 25, 1999.

This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1338 and 2201. Defendant does not contest personal jurisdiction, as it does business within the State of New York. Venue is proper pursuant to 28 U.S.C. § 1391(b).

## III. Factual Background

### A. The Parties

Pepperidge Farm is a Connecticut corporation with its principal place of business in Connecticut. *See* Answer at ¶ 31. PF Brands, Inc. is a Delaware Corporation with its principal place of business in Delaware. *Id.* at ¶ 30. Together, they engage in the development, production, advertisement and sale of crackers, snack mixes, pastries, cookies, and other bakery products. *See id.* at 34. Founded in 1935, Pepperidge Farm joined the Campbell

Soup Company in 1961 and has been producing Goldfish crackers continuously since 1962. *See* Callaghan Decl. at ¶¶ 4–6, Supplemental Memorandum in Support of Pepperidge Farm's Motion for a Preliminary Injunction at 4. The Goldfish line of products includes original, cheddar cheese, pretzel, pizza, nacho and wheat Goldfish, as well as mixes of Goldfish with pretzels and other snacks. *See* Supplemental Declaration of Patrick Callaghan, dated January 22, 1999 ("Callaghan Supp. Decl.") at ¶ 14, Ex. 1.

One of Pepperidge Farm's main competitors in the cookie and cracker industry is Nabisco, Inc., a New Jersey corporation with its principal place of business in New Jersey, and Nabisco Brands Company, a Delaware Corporation with its principal place of business in Delaware. *See* Compl. at ¶¶ 1, 2. When measured by sales volume, Nabisco's cheese cracker product, "Cheese Nips", is the third best-selling brand in the cheese-cracker market behind Pepperidge Farm's Goldfish crackers and Sunshine Biscuit Company's "Cheez-It" cheese snack cracker. *See* Callaghan Supp. Decl. at ¶ 3, Ex. A at 2. When measured in sales dollars, Pepperidge Farm's Goldfish are the number one ranking cheese snack cracker. *Id.*

### B. Product and Market Development

#### 1. Pepperidge Farm

The first television advertisement for Pepperidge Farm's Goldfish aired in 1974. *See* Callaghan Decl. at ¶ 7. In 1994, Pepperidge Farm launched an aggressive marketing and advertising campaign of its Goldfish brand directed at children. While the target market for Goldfish purchasers is mothers aged 18–49, approximately half of the consumers of the product are children who, for the most part, drive the purchasing decision.[6] *See* Callaghan Supp.

---

5. Nabisco has agreed to postpone the CatDog launch until February 8, 1999, pending this Court's decision on the preliminary injunction.

6. Households with children account for approximately 51% of Goldfish consumption, and it is these consumers that concern Pepperidge Farm. A 1995 Campbell Soup Compa-

Decl. at ¶ 11, Ex. F. Pepperidge Farm increased its total spending on advertising and promotions from about $16 million in fiscal year 1995 to over $49 million in fiscal year 1998. *Id.* at ¶ 5. Between 1995 and 1998, Pepperidge Farm spent a total of more than $120 million marketing the Goldfish line. *Id.* Pepperidge Farm's print and broadcast advertisements for Goldfish brand products prominently feature the Goldfish design. *Id.* at ¶¶ 6 and 8, Callaghan Decl. at ¶ 8. The Goldfish design has also received substantial unsolicited media coverage, including a segment on the "Today" Show, a cameo appearance on the "Friends" sit-com, and numerous articles in the popular and trade press. *Id.* at ¶ 10, Ex. E.[7]

Pepperidge Farm's sale of Goldfish in the past four years has increased dramatically. In fiscal year 1995, net U.S. sales of Goldfish through regular retail channels (exclusive of export or food service) was over $93 million. By fiscal 1998, net sales had more than doubled to $200 million. In the aggregate, Pepperidge Farm has sold $500 million in Goldfish products in the United States in the past four years. *See* Pepperidge Farm's Motion for a Preliminary Injunction at ¶ 9.

### 2. Nabisco

In the spring of 1998, Nabisco was approached by the Nickelodeon Television Network ("Nickelodeon") about the possibility of a joint promotional agreement between the two companies. Nickelodeon sought to promote its newly created "CatDog" cartoon program, which debuted in October, through tie-ins with products, such as Burger King, Jell–O, and Duracell. *See* "The $20M Truth About CatDog,"

Brandweek, Vol. XXXX, No. 3, January 18, 1999 at 1, attached to Callaghan Supp. Decl., Ex. J. Nickelodeon presented Nabisco with marketing materials and a short video featuring the cartoon. Without concept-testing the idea or conducting any market research, Nabisco entered into a Joint Promotion Agreement ("JPA") with Nickelodeon on August 3, 1998. *See* Deposition of Paula Brenner ("Brenner Dep.") at 38. According to Brenner, the Senior Brands Manager for Nabisco's Kids Brands Division, concept-testing of the product could not be performed at the time because the cartoon program had not yet been broadcast. *Id.*

The JPA grants Nabisco the right to produce cheese crackers in shapes from the CatDog cartoon as an "in and out" product for the promotional period of January 1, 1999 to March 30, 1999. The JPA further provides that Nabisco may not use the CatDog marks after that date, except at point of sale for a 90–day sell-off period. *See* Declaration of William Blemleck, Director of Product Development for New Business in the Biscuit Division of Nabisco, January 19, 1999 ("Blemleck Decl."), Ex. 5. During the January 25 evidentiary hearing, Nabisco acknowledged that it is currently seeking an extension of the JPA beyond March 30, 1999. *See* Transcript of Hearing, January 25, 1999 ("Tr.") at 10–11.

Nabisco plans to use the joint promotion to extend its line of Cheese Nips by launching a new product under the trademark "CatDog", targeted at children ages 6–12 (the same target age for the television program). *See* Brenner Decl. at ¶¶ 9, 14. The program's main character is CatDog, an odd looking creature, half cat and half dog, with a dual personality. The Cat

ny study indicated that consumption of Goldfish by children ages two to five-years old accounts for 12% of brand volume, and adult consumption accounts for approximately 56%. *See* Campbell Soup Company memorandum, dated October 25, 1995, attached to the Declaration of James Swire, counsel for Nabisco, dated January 22, 1999 ("Swire Decl."), Ex. 5.

7. For example, in October of 1998, the New York Times ran a full page article on the success of the Goldfish brand. *See* Constance Hays, "Will Goldfish Tactics Help Campbell's Soups?" N.Y. Times, October 18, 1998, attached to Pepperidge Farm's Motion for a Preliminary Injunction, Ex. 8.

is fastidious and emotionally reserved; the Dog is slovenly and boisterous. *Id.* at ¶ 10, Ex. 1, 4. According to Nabisco, this duality is symbolically represented in the cartoon by the images of a fish and a bone (their respective eating preferences). The CatDog lives in a house in the shape of a bone and a goldfish.[8] The shapes appear on the wallpaper and furniture throughout the house, in Nickelodeon's marketing material and on its web page. *See* http:// www.nick.com. Visitors to Nickelodeon's CatDog website are invited to download the fish/bone pattern "wallpaper" to use as a screen saver on their computers. The cartoon does not, however, contain a fish character.[9]

The CatDog product is a mix of three shapes: 50% of the cheese crackers are in the shape of the CatDog character; 25% in the shape of a bone; and 25% in the shape of a goldfish. Nabisco maintains that its decision to include a fish-shaped cheese cracker was not motivated by an intent to resemble Pepperidge Farm's Goldfish. In July 1998, Nabisco's product and marketing development personnel first met to discuss the development of CatDog. Mr. Blemleck, Director of Product Development, selected the CatDog, bone and fish shaped crackers for several reasons, including: (1) to heighten the sense of fun that children associate with the CatDog; (2) to bring the duality of the CatDog program to life in the product; and (3) to reduce product breakage during shipment by including smaller, denser pieces of the fish-shaped cracker along with the long, thin CatDog cracker. *See* Brenner Decl. at ¶¶ 9–10, Ex. 4; Blemlek Decl. at ¶¶ 2–3.[10]

Nabisco acknowledges that it intended the CatDog form to compete with Sunshine's "Heads and Tails" brand of cheese crackers. Sunshine's product allows children to mix and match crackers in the shapes of the heads and bodies of various animals. *See* Brenner Decl. at ¶ 6. According to Blemleck, there was only one "passing reference" to Pepperidge Farm Goldfish during all of Nabisco's product development meetings—to the effect that the CatDog fish looked nothing like the Pepperidge Farm Goldfish. *See* Blemleck Decl. at ¶ 4. Apparently, the only other specific reference to Pepperidge Farm's Goldfish occurred when Ms. Brenner requested the advice of Steve Hartman, Nabisco's Chief Trademark Counsel, as she is required to do for all new products. *Id.* at ¶ 12.

To date, Nabisco has approximately $3.4 million in inventory of the CatDog product awaiting distribution. *See* Declaration of James McCormick ("McCormick Decl."), Vice President of Field Sales in the Biscuit Division of Nabisco, at ¶ 6. In addition, Nabisco has already developed television and print advertising, including full-page advertisements and free-standing inserts and coupons for Sunday newspapers. *Id.* at ¶ 7.

## IV. Applicable Legal Standard

To obtain a preliminary injunction, the moving party must show: (1) likelihood of irreparable harm should the injunction be denied; and (2) either (a) likely success on the merits, or (b) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly in its favor. *See Jackson Dairy,*

---

8. By "goldfish" I am referring to the shape of the fish, not to its color.

9. In fact, in the promotional video Nickelodeon originally used to pitch its product tie-in proposal to Nabisco, the fish shape appears only fleetingly. Although the CatDog house is built in the shape of a fish and a bone, it appears on the screen only a few times, for a few seconds. The fish on the wallpaper and furniture are almost indiscernible. If one

were to sneeze while watching that portion of the video, one would miss the fish shape entirely.

10. Nabisco is also licensed to use (and has made a die) for the shape of another character on the show, Winslow Oddfellow, but has decided not to produce and market this shape. *See* Blemlek Decl. at ¶ 6.

*Inc. v. H.P. Hood & Sons. Inc.*, 596 F.2d 70, 72 (2d Cir.1979) (per curiam). "The award of a preliminary injunction is an extraordinary remedy, and will not be granted except upon a *clear showing* of probable success and possible irreparable injury." *Beech–Nut, Inc. v. Warner–Lambert Co.*, 480 F.2d 801, 803 (2d Cir.1973) (emphasis added); *Kraft General Foods, Inc. v. Allied Old English*, 831 F.Supp. 123, 127 (S.D.N.Y.1993).

■ In a trademark dilution case, "[d]ilution is itself an injury which [cannot] be recompensed by money damages." *Deere & Co. v. MTD Prods., Inc.*, 860 F.Supp. 113, 122 (S.D.N.Y.), *aff'd*, 41 F.3d 39 (2d Cir.1994) (quoting *American Express Co. v. Vibra Approved Lab. Corp.*, 10 U.S.P.Q.2d 2006, 2013, No. 87 Civ. 8840, 1989 WL 39679 (S.D.N.Y. April 19, 1989)). Dilution has been described as the "gradual whittling away of a firm's distinctive trade-mark or name," *Hormel Foods Corp. v. Jim Henson Productions, Inc.*, 73 F.3d 497, 506 (2d Cir.1996) (quoting *Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.*, 42 N.Y.2d 538, 399 N.Y.S.2d 628, 369 N.E.2d 1162 (1977)), and once a trademark has become diluted, it has lost the strength it once possessed. A showing of a likelihood of dilution, therefore, will establish irreparable harm under Section 43(c). *See Deere*, 860 F.Supp. at 122.

■ Similarly, in a trademark infringement case, where there is a showing "that an appreciable number of ordinarily prudent purchasers are likely to be misled or indeed simply confused, as to the source of the goods in question, the court may find irreparable injury." *Tough Traveler, Ltd. v. Outbound Products*, 60 F.3d 964, 967 (2d Cir.1995) (citing cases discussing this standard); *see also Standard & Poor's Corp. v. Commodity Exchange*, 683 F.2d 704, 708 (2d Cir.1982) ("In the preliminary injunction context, a showing of likelihood of confusion as to the source or sponsorship establishes the requisite likelihood of success on the merits as well as risk of irreparable harm").

## V. Initial Threshold for Protectability of Trademarks

■ Claims for protection against dilution and infringement both require that the marks be: (1) used in commerce, (2) nonfunctional and (3) distinctive. While all such marks may be protected against infringement, under the Federal Trademark Dilution Act of 1995 only famous and distinctive marks are eligible for protection against dilution.

### A. Commercial Use

There is no dispute that both Nabisco's and Pepperidge Farm's products are used in commerce. *See* 15 U.S.C. § 1125(a), (c).

### B. Non–Functionality

■ To be protected under the Lanham Act, a trademark or trade dress must not be functional. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 775, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). A claimed mark is "functional", and therefore unprotected, if it is "essential to the use or purpose of the article or if it affects the cost or quality of the article." *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 850 n. 10, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982). Nabisco implies that animal-and fish-shaped crackers are 'functional' in the sense that they may reduce breakage during shipment and are appealing and fun for children. *See* Nabisco's Memorandum of Law in Opposition to Motion for Preliminary Injunction ("Pl. Mem. in Opp'n.") at .16, 18. Contrary to this creative argument, however, there is nothing "essential to the use or purpose" of a cheese cracker requiring it to be shaped like a goldfish. In addition, breakage would not affect "the quality of the article" if the snack cracker were a functional square.

### C. Distinctiveness

Pepperidge Farm uses the term "configuration trademark" to signify its trade-

mark on the Goldfish design. Nabisco argues that the configuration of the fish-shaped cracker is not a protectable trademark, but rather is product configuration trade dress, subject to the heightened standards of distinctiveness set forth by the Second Circuit. Although Nabisco states that the Court need not address this issue at this stage of the proceeding,[11] the question of whether Pepperidge Farm's mark is an incontestable configuration trademark or trade dress may affect Pepperidge Farm's likelihood of success on the merits. As a result, both the distinctiveness of Goldfish as a configuration trademark and as trade dress must be considered.

### 1. Incontestability of Product Configuration Mark

Pepperidge Farm argues that its configuration mark is incontestable, barring any argument that it is not distinctive. A mark becomes "incontestable" through five years' use after federal registration and compliance with statutory formalities. *See* 15 U.S.C. § 1065. Once a mark has achieved incontestable status, "it is conclusively presumed either that the mark is non-descriptive, or if descriptive, has acquired a secondary meaning." 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 15:35 (4th ed. 1998) ("McCarthy") at 15–53. Pepperidge Farm registered its configuration trademark for the Goldfish design for crackers on April 9, 1991, conceivably achieving incontestable status through five years use on April 9, 1996. If the configuration mark is incontestable under 15 U.S.C.

§ 1065, it is presumed to have met the threshold distinctiveness requirement for a trademark infringement or dilution claim.

 An incontestable mark is, however, subject to the eight defenses enumerated in § 1115(b).[12] Nabisco raises the fourth defense against its alleged infringement of Pepperidge Farm's mark—that Nabisco intends to use the fish shape descriptively to communicate a personality attribute of the CatDog. Nabisco's theory is flawed. A cracker in the shape of a fish would be descriptive if, for example, the cracker were fish-flavored. *See e.g., Car-Freshner Corp. v. S.C. Johnson & Son, Inc.,* 70 F.3d 267 (2d Cir.1995) (sale of pine-tree shaped air-deodorizer with pine scent neither infringed nor diluted trademark of owner of pine-tree line of car air-fresheners). The fish shape is not descriptive of the product—a cracker. It may, however, be 'descriptive' in a different sense (i.e. not as a term of art in intellectual property law) because it represents a personality trait of the CatDog character on which Nabisco's product is based.

### 2. Inherently Distinctive Trade Dress

 Even if Pepperidge Farm's mark is not presumed distinctive through incontestability, it may still meet the requirement as inherently distinctive trade dress. Historically, "trade dress" connoted only the manner in which a product was "dressed up" to go to market, i.e. its label, package or display card. Today, trade dress has taken on a broader meaning to include "the design and appearance of the product as well as that of the container

**11.** Nabisco intends to pursue its cancellation claim against Pepperidge Farm's trademark as this litigation moves forward.

**12.** An alleged infringer may argue that: (1) registration was obtained fraudulently; (2) the mark has been abandoned; (3) the mark is used to misrepresent the source of the goods in connection with which it is used; (4) the allegedly infringing mark is used, otherwise than as a mark, as the alleged infringer's individual name in her own business, or the term is descriptive of and used fairly and in

good faith to describe the alleged infringer's goods or their geographic origin; (5) the allegedly infringing mark was adopted without knowledge of the registrant's prior use and has been used continuously for a certain period of time; (6) the allegedly infringing mark was registered and used prior to the infringed mark's registration; (7) the mark is being used to violate the antitrust laws; and (8) the infringement is subject to equitable defenses, such as laches, estoppel, and acquiescence.

and all elements making up the total visual image by which the product is presented to customers." *Jeffrey Milstein. Inc. v. Greger, Lawlor, Roth, Inc.,* 58 F.3d 27 (2d Cir.1995); *see also* 1 *McCarthy* § 8:1 at 8–2. The definition of trade dress has now been "stretched to include the shape and design of the product itself." *Id.,* § 8.5 at 8–14.

In order to receive trade dress protection, a product must be either inherently distinctive or have acquired distinctiveness by achieving a "secondary meaning" in the marketplace. *See Two Pesos,* 505 U.S. at 769, 112 S.Ct. 2753. The inquiry into distinctiveness turns on the total appearance of the product, not on individual elements. When assessing distinctiveness of a product design or configuration, courts in this Circuit ask "whether the design [is] likely to be understood as an indicator of the product's source." *Landscape Forms, Inc. v. Columbia Cascade Co.,* 113 F.3d 373, 378 (2d Cir.1997) (citing *Knitwaves, Inc. v. Lollytogs Ltd.,* 71 F.3d 996, 1008 (2d Cir.1995)). The standard for determining the inherent distinctiveness of a product's design is more rigorous than that for determining the inherent distinctiveness of the product's packaging. *See Knitwaves,* 71 F.3d at 1008–09.

In *Knitwaves,* the court held that a line of children's sweaters featuring copyrighted leaf and squirrel designs was not protectable trade dress because the designs were not likely to be understood by consumers as an indication of the manufacturer of the sweaters. *See id.* at 1006. In *Landscape Forms,* the Second Circuit held that a manufacturer of a line of outdoor furniture failed to indicate what "unique combination of features" made the design inherently distinctive. *Landscape Forms,*

113 F.3d at 381. After *Landscape Forms* and *Knitwaves,* there was doubt in the Second Circuit as to whether a product's design could ever be protectable trade dress.

In *Samara Bros. v. Wal–Mart Stores, Inc.,* 49 U.S.P.Q. 1260, 165 F.3d 120 (2d Cir.1998), however, the Second Circuit, analyzing a line of children's clothing, resolved some of the doubt presented by *Landscape Forms* and *Knitwaves.* Finding that the high level of specificity of Samara's clothing line created a recognizable "distinctive overall look," the court held that the line possessed sufficiently distinctive trade dress warranting protection under Section 43(a).[13] *Id.,* at 126–27. In *Samara,* the manufacturer had chosen to design its clothing line using consistent design elements so that the look would be identified with the company. The company had been producing the same product for years, and the product line represented the core of its business. *See id.* at 123–24. The court, departing from *Knitwaves'*s emphasis on the intent of the manufacturer, considered both the manufacturer's subjective intent in designing the line as well as an objective view of the line in finding plaintiff's trade dress to be protectable under Section 43(a).

It is apparent that even under this more rigorous standard, the product design of the Goldfish may be considered distinctive if it is "likely to serve primarily as a designator of origin of the product." *Id.* at 123. In determining whether the Goldfish is a source identifier, subjective considerations of the manufacturer's intent, an objective viewing of the product, and the similarity of Goldfish to other products in the market are all relevant. *See* 1 *McCarthy* § 8–13; *see also Seabrook*

---

13. These specific design elements included: "seersucker fabric; large bold appliques; large collars with the appliques generally integrated into the collar and any pockets on the garment; general absence of printed images, black outlines, alphanumeric characters, three-dimensional features or heavy ornamentation (such as bibs or fringe) which are frequently used in children's clothing; and full-cut, one-piece conservative bodies." *Samara,* at 126. *But see Landscape Forms,* 113 F.3d at 382 (design of outdoor benches not inherently distinctive trade dress because no unifying feature present in each bench save the use of one three-inch curved steel pipe for support).

*Foods, Inc. v. Bar–Well Foods, Ltd.*, 568 F.2d 1342, 1344 (Cust. & Pat.App.1977).

■ Relying on these factors, I find that the Goldfish is likely to be perceived as a designator of origin of the product. The Goldfish shape, unlike the clothing in *Samara,* is an uncomplicated design. The multitude of Pepperidge Farm advertising samples provided to this Court reveals that this simple goldfish shape is *the* element which Pepperidge Farm hopes consumers readily identify and associate with its snack cracker products. *See* advertisements provided in Index of Exhibits Submitted in Support of Motion for Preliminary Injunction, Exs. 11–15. The Goldfish shape, the most salient feature of the product design, dominates these advertisements. Pepperidge Farm has produced Goldfish continuously for thirty-seven years. The shape is extremely well known in the snack cracker trade.[14] In addition, the abundance of unsolicited media attention garnered by the Goldfish indicates that the public recognizes the shape of the Goldfish as a source identifier. While in *Samara* the court found distinctiveness in the many details of the line of clothing, here distinctiveness arises from one overwhelming element of the product—the simply designed, identically-shaped Goldfish.

Because the Goldfish are inherently distinctive, there is no need to address whether the product design has acquired a secondary meaning.[15] In order to obtain a preliminary injunction, Pepperidge Farm must now satisfy the remaining requirements of a dilution claim—a famous mark and either blurring or tarnishment—or the requirements of a trademark infringement claim by showing a likelihood of confusion.

## VI. Pepperidge Farm's Dilution Claim

Pepperidge Farm seeks to preliminarily enjoin Nabisco from using the goldfish shape on the ground that it would dilute the Goldfish mark in violation of New York state law and Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c). The New York and federal statutes are similar in many respects and may be analyzed together. Both require that the mark have a "distinctive quality." In addition, both statutes permit a claim for dilution regardless of whether there is proof of consumer confusion.

### A. New York General Business Law § 368–d

The New York General Business Law provides that:

> [l]ikelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of the goods or services.

N.Y. Gen. Bus. Law § 368–d.

■ "In sum, the statute protects a trademark's 'selling power.'" *Mead Data*

---

14. Nabisco itself keenly recognizes that the Goldfish mark identifies Pepperidge Farm. At one point, during the February 1998 New York Food, Beverage, and Tobacco Conference, James M. Kilts, President and Chief Executive Officer of Nabisco, displayed the Goldfish mark overlaid with the universal prohibition symbol of a diagonal slash to approximately 300 industry analysts and company representatives without referring to the product by name. *See* Declaration of Leonard Griehs, Vice President of Investor Relations, Campbell Soup Company, dated January 22, 1999 at ¶¶ 4, 5. Obviously this display was well within the bounds of legitimate competition. I include it only to demonstrate the high level of recognition that the Goldfish image receives within the industry.

15. Pepperidge Farm presented a study conducted by Walter McCullough in January 1999 in which he determined that the appearance of Goldfish has acquired secondary meaning. Nabisco criticizes the survey, primarily on the ground that the survey did not include a control group. Because I find the Goldfish to be inherently distinctive, I do not address the reliability of this study.

*Central, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 875 F.2d 1026, 1030 (2d Cir. 1989) (quoting *Sally Gee, Inc. v. Myra Hogan, Inc.*, 699 F.2d 621, 624–25 (2d Cir. 1983)). In order to establish a claim for dilution under New York law, two elements must be shown: (1) ownership of a distinctive mark, and (2) a likelihood of dilution. *See Hormel*, 73 F.3d at 506 (2d Cir.1996); *Sally Gee*, 699 F.2d at 625.

 The second element may be established by a showing of either tarnishment or blurring. Blurring involves an injury to the mark's selling power, and occurs when there is a possibility that the mark will lose its ability to serve as a unique identifier of an owner's products, due to another party's use. "[B]lurring sufficient to constitute dilution requires a case-by-case factual inquiry." *Mead Data*, 875 F.2d at 1035 (Sweet, J., concurring).[16] In *Mead Data*, Judge Sweet articulated a six-step analysis for considering the likelihood of dilution by blurring: 1) similarity of the marks; 2) similarity of the products covered by the marks; 3) sophistication of consumers; 4) predatory intent; 5) renown of the senior mark; and 6) renown of the junior mark. *See id.* These factors are balanced to determine whether a likelihood of dilution by blurring exists.[17]

### B. Federal Trademark Dilution Act of 1995

 The Federal Trademark Dilution Act of 1995 (the "FTDA"), 15 U.S.C. § 125(c), establishes a federal cause of action against persons who trade on the goodwill of famous marks to dilute their distinctiveness. The FTDA protects famous marks and famous trade dress even in the absence of a likelihood of confusion. *See, e.g.; I.P. Lund Trading ApS v. Kohler Co.*, 163 F.3d 27, 49 U.S.P.Q.2d 1225 (1st Cir.1998); *Clinique Laboratories, Inc. v. Dep Corp.*, 945 F.Supp. 547 (S.D.N.Y. 1996); *Sara Lee Corp. v. American Leather Products*, No. 97 C 4158, 1998 WL 433764 (N.D.Ill. July 29, 1998).

Section 43(c) of the Lanham Act states in pertinent part:

> The owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark. . . .

15 U.S.C. § 1125(c). "Dilution" in the Act is defined as "the lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of—(1) competition between the owner of the famous mark and other parties, or (2) likelihood of confusion, mistake, or deception." 15 U.S.C. § 1127.

Because the FTDA was enacted just three years ago, precise standards for interpreting the statute have not yet emerged.[18] The legislative history of the

16. This case construed only the New York General Business Law. The federal statute had not yet been passed.

17. Courts and commentators have criticized the Sweet factors for introducing considerations that "are the offspring of classical likelihood of confusion analysis and are not particularly relevant or helpful in resolving the issues of dilution by blurring." 3 *McCarthy* § 24:94.1. The First Circuit rejects the Sweet factors in a dilution analysis and instead proposes an inquiry into "whether target customers will perceive the products as essentially the same." *I.P. Lund Trading ApS v. Kohler Co.*, 49 U.S.P.Q.2d 1225, 163 F.3d 27, 32–33,

(1st Cir.1998). The Second Circuit has not yet addressed this criticism, and the Sweet factors appear to remain the law in a dilution analysis in this Circuit. *See Sports Authority, Inc. v. Prime Hospitality Corp.*, 89 F.3d 955 (2d Cir.1996) (applying Sweet factors to dilution claim); *Deere & Co. v. MTD Products, Inc.*, 41 F.3d 39, 43 (2d Cir.1994) (referring to Sweet factors as "traditional six-factor test" for dilution).

18. Congress thought federal protection was necessary, given that at the time of the Act's passage, only half of the fifty states had laws protecting trademarks from dilution. *See* 141 Cong. Rec. H14317–01, H14317 (daily ed.

Act indicates that its purpose is "to protect famous trademarks from subsequent uses that blur the distinctiveness of the mark or tarnish or disparage it, even in the absence of a likelihood of confusion." H.R.Rep. No. 374, 104th Cong., 1st Sess. 3 (1995) U.S.Code Cong. & Admin. News 1995 pp. 1029, 1030. The Act created a federal cause of action to protect trademarks from unauthorized users who "attempt to trade upon the goodwill and established renown of such marks." *Id.*

The language of the FTDA requires that a mark be truly "distinctive and famous," a higher standard than that required for ordinary Lanham Act protection. 15 U.S.C. § 1125(c)(1).[19] The statute provides a non-exclusive list of eight factors that courts should consider in determining whether a mark is "distinctive and famous." 15 U.S.C. § 1125(c)(1). The eight factors are: (1) the degree of inherent or acquired distinctiveness of the mark; (2) the duration and extent of use of the mark in connection with the goods; (3) the duration and extent of advertising and publicity of the mark; (4) the geographical extent of the trading area in which the mark is used; (5) the channels of trade for the goods or services with which the mark is used; (6) the degree of recognition of the mark in the trading areas and channels of trade used by the mark's owner and the person against whom the injunction is sought; (7) the nature and extent of the use of the same or similar marks by third parties; and (8) whether the mark was registered under the Act as of March 3, 1881, or the

Act of February 20, 1905, or on the principal register.

### 1. Ownership of a Famous Mark

#### a) the degree of inherent or acquired distinctiveness of the mark

■ Congress indicated that courts should be discriminating in categorizing a mark as "famous." *See* House Rep. 104–374 (Nov. 30, 1995). The "distinctiveness" of the mark, as the term is used in this context, is essentially synonymous for fame and not a term of art.[20] Therefore, it is necessary for a mark to be more than merely inherently distinctive (or to have acquired distinctiveness through secondary meaning). The threshold finding of distinctiveness discussed above is a necessary, but not sufficient, element of fame. This factor requires consideration of the strength and fame of the mark.

Pepperidge Farm has produced and sold Goldfish continuously since 1962. When measured in sales dollars, Pepperidge Farm's Goldfish are the number one ranking cheese snack cracker.[21] *See* Callaghan Supp. Decl. at ¶ 3. Between 1995 and 1998, Pepperidge Farm spent a total of more than $120 million marketing the Goldfish line. The Goldfish brand, particularly its recent marketing and success, have received extensive and unsolicited media coverage. It is recognized among consumers, the media, and the cracker and cookie industry as a famous brand.

---

Dec. 12, 1995) (statement of Rep. Moorhead). Because protection was "only available on a patch-quilt system," Congress sought to discourage forum-shopping and give authority to federal courts to issue nationwide injunctions based upon trademark dilution. *Id.* at H14318.

19. *See, e.g., I.P. Lund,* 163 F.3d 27, 32–33 (manufacturer who wished to establish fame and distinctiveness of trade dress/product design of water faucet under FTDA bore significantly greater burden than the burden of establishing distinctiveness for infringement purposes).

20. For a brief discussion of legislative history regarding the meaning of the term, *see* 3 *McCarthy* § 24:91 at 24–147.

21. In fact, Goldfish's robust sales within the past few years have encouraged its parent, the Campbell Soup Company, to imitate Pepperidge Farm's management style to reinvigorate other brands. *See* Constance L. Hays, "Will Goldfish Tactics Help Campbell's Soups?," N.Y. Times, October 18, 1998.

A certain degree of third-party use of the mark may indicate a weakened mark. *See Lever Bros. Co. v. American Bakeries Co.*, 693 F.2d 251, 256–57 (2d Cir.1982). Nabisco argues that Pepperidge Farm has lived in "peaceful coexistence" with numerous third-party uses of aquatic-shaped animal crackers, such as "Guppies" by Prepared Products .Co., "Dolphins & Friends" by Austin Quality Foods, Inc., "Whales" by the Stauffer Biscuit Company, and "Nantucket Cheese Whales" by the Bachman Company. *Compare* photographs attached to Pl. Opp'n. Mem., Exs. 3–6.

While whales, guppies, and dolphins are all sea creatures, none of these crackers are goldfish-shaped. "The owner of a mark is not required to police every conceivably related use thereby needlessly reducing non-competing commercial activity and encouraging litigation in order to protect a definable area of primary importance." *Playboy Enterprises, Inc. v. Chuckleberry Publishing, Inc.*, 486 F.Supp. 414, 422–23 (S.D.N.Y.1980), *aff'd*, 687 F.2d 563 (2d Cir.1982).

Nabisco also argues that Pepperidge Farm tolerated Nabisco's use of two animal-shaped crackers, which it marketed during the past eight years. The first, Ritz Ark Animals, sold from 1995 to 1998, does not appear to contain any fish-shaped crackers remotely resembling a goldfish. *See* photograph attached to Pl. Opp'n. Mem., Ex. 8 The second, "Snorkels," which Nabisco produced between 1992 and 1996, does indeed contain goldfish in a mix of six different animal-shaped crackers.[22] *See* photograph attached to Pl. Opp'n. Mem., Ex. 7. Pepperidge Farm acknowledged at the January 25 hearing that it had made a mistake in not challenging "Snorkels" in 1992. *See* Tr. at 13–14. However, in the four years Nabisco produced "Snorkels," its market share was very small, holding, at its height, only .3% of the snack cracker market. *See* Tr. at 10. This small third-party use of a goldfish-shaped cracker did not diminish the strength of the Goldfish mark.

Despite very limited third-party use, the Goldfish configuration mark is exceptionally strong. This factor, then, weighs in favor of the Goldfish mark being "distinctive and famous" under 15 U.S.C. § 1125(c)(1).

b) **the duration and extent of use of the mark in connection with the goods or services with which the mark is used**

The relevant criteria used to assess this factor are similar to those criteria used to show that a mark is strong or has acquired secondary meaning in the context of finding distinctiveness. *See* 3 McCarthy § 24:92 at 24–152.[23] As described above, Goldfish crackers have been available since 1962. They are ranked as the number one selling cheese snack cracker in sales dollars and the number two selling cheese snack cracker in sales volume. Between August 1997 and August 1998, Goldfish reached over $234 million in total sales. *See* Callaghan Supp. Decl., Ex. A at 2. This extended duration and high volume of use tend to make the Goldfish mark distinct and famous.

c) **the duration and extent of advertising and publicity of the mark**

This factor focuses on advertising. *See* 3 *McCarthy* § 24:92 at 24–152. Pepperidge Farm has spent over $120 million in

---

22. "Snorkels" included whales, sharks, lobsters, sea horses, star-fish, and goldfish. *See* Pl. Opp'n. Mem. at Ex. 7.

23. The Second Circuit considers several factors in determining secondary meaning for distinctiveness, including: (1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and, (6) length and exclusivity of the mark's use. *See Genesee Brewing Company, Inc. v. Stroh Brewing Company*, 124 F.3d 137, 143 (2d Cir.1997); *Centaur Communications v. A/S/M Communications*, 830 F.2d 1217, 1222 (2d Cir.1987).

aggressive advertising between 1995 and 1998 to market the Goldfish line. The print advertisements call attention to the product configuration, prominently displaying the Goldfish form. In addition, Pepperidge Farm's Goldfish have received widespread, unsolicited attention in the general media.[24] This intense level of advertising and publicity weighs in favor of finding that the mark is famous.

### d) the geographical extent of the trading area in which the mark is used

The geographic fame of a mark must extend throughout the United States, or at least through a substantial portion of the country. *See* Cong. Rec. 19310 (Dec. 29, 1995); Cong. Rec. H14317 (Dec. 12, 1995); House Rep. 104–374 (Nov. 30, 1995). Goldfish are distributed internationally. Within the United States, Goldfish are sold in all fifty states through groceries, mass-merchandisers, delicatessens, vending machines, food service channels, and club stores. *See* Callaghan Decl. at ¶ 15. Obviously, this factor lends fame to the mark.

### e) the channels of trade for the goods or services with which the mark is used

This factor requires a court to define the product line or market in which the mark has been used and has become famous.

The Goldfish mark is famous in the area of cheese cracker snack foods.

### f) the degree of recognition of the mark in the trading areas and channels of trade used by the mark's owner and the person against whom the injunction is being sought

Both Nabisco and Pepperidge Farm compete in the food market and more specifically the cheese cracker snack food market. Thus, any recognition of the Goldfish in that market weighs in favor of finding that Goldfish is a famous mark. The Goldfish mark clearly has a high degree of recognition among the trade press [25] and within the trade. This factor, too, favors a finding that Goldfish is a famous mark.

### g) the nature and extent of the use of the same or similar marks by third parties

If a mark "is merely one in a crowd of similar marks, [it] will not usually be famous." 3 *McCarthy* at § 24:92 at 24–157. Nabisco has offered evidence of snack crackers in the shape of other aquatic animals, such as whales and dolphins. The only use of a goldfish-shaped cracker, other than by Pepperidge Farm, was Nabisco's "Snorkels" product. As discussed above, the minuscule market share of that product indicates that it did not weaken the Goldfish mark.

**24.** *See, e.g.,* Constance L. Hays, "Will Goldfish Tactics Help Campbell's Soups?," N.Y. Times, October 18, 1998; Bob Fernandez, "Plump Little Goldfish Swim to New Heights," Philadelphia Inquirer, June 14, 1998; "Happy as a Clam", Daily News, September 27, 1997; "Feed 'Em With a Smile," Boston Globe, August 20, 1997; "Are We Really Smiling Less—Or Just Expecting More?" Dallas Morning News [date unavailable]; attached to Callaghan Supp. Decl. Ex. 4.

**25.** *See, e.g.,* Stephanie Thompson, "Grinning Goldfish Now Backs Soups," Brandweek, February 9, 1998; Joanna Trapp, "The Marketing 100," Advertising Age, June 20, 1997;

Judann Pollack, "Goldfish Hooks Kareem to Help Push Snack Brand," Advertising Age, November 11, 1996; "Campaigns," P–O–P Times, October 1997; "Pepperidge Farm Rolls Out 'Smiley' Goldfish," Snack World [date unavailable]; "Pepperidge Farm Goes Back to School with Goldfish Promo," Brandweek, October 13, 1997; "Smiley Goldfish Latest 'Special Edition' Snack," Food People [date unavailable]; "Pepperidge Plays Go Fish," Advertising Watch [date unavailable]; "Pepperidge Farm Goldfish," Griffin Report [date unavailable]; "Gone Fishin'," Convenience Store Decisions [date unavailable]; attached to Callaghan Decl. at Ex. 4.

**h) whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.**

This factor permits a court to find that a mark cannot be famous if it is not federally registered. Seven variations of the Pepperidge Farm Goldfish design and name are registered.

### i) Conclusion

After considering the above eight factors, I find the Goldfish mark to be "famous and distinctive" within the meaning of the Lanham Act § 43(c)(1), 15 U.S.C. § 1125(c)(1).

### 2. Likelihood of Dilution

 Once a mark's fame has been established, the court must consider whether dilution is likely to occur. Pepperidge Farm claims dilution of its mark through blurring and tarnishment.[26] As mentioned above, courts in this Circuit apply the six Sweet factors in determining if there is a likelihood of dilution. After analyzing those factors, I conclude that Pepperidge Farm has shown a likelihood of dilution by blurring.

26. Tarnishment occurs when a party's mark is used by another in association with inferior or unwholesome goods or services. *See, e.g., Hormel*, 73 F.3d at 507; *Deere*, 41 F.3d at 43. In addition, tarnishment may also result from an association with obscenity, or sexual or illegal activity. *See Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 467 F.Supp. 366 (S.D.N.Y.), *aff'd*, 604 F.2d 200 (2d Cir.1979). "The sine qua non of tarnishment is a finding that plaintiff's mark will suffer negative associations through defendant's use." *Hormel*, 73 F.3d at 507. Pepperidge Farm claims that it must protect its wholesome, "family-oriented" product and image from tarnishment by association with the "coarse and/or unsavory elements" of Nickélodeon's CatDog program. While Pepperidge Farm might cringe at CatDog's depiction of "garbage and sewers" or its cartoon violence, these elements of the program do not rise to the level of tarnishment. The

### a. Similarity of the Marks

The FTDA is silent as to how similar the conflicting marks must be to create the requisite 'dilution'. However, it is well-established under New York's anti-dilution statute that in the absence of "[substantial] ... similarity ... there can be no viable claim of dilution." *Mead Data*, 875 F.2d at 1029. Thus a finding of substantial similarity between the marks is a prerequisite to *any* finding of dilution. In analyzing this prong, the first Sweet factor teaches that the greater the similarity between the marks, the more likely that blurring will occur. *See id.* at 1035.

The Goldfish crackers and the CatDog goldfish are substantially similar. They are both small, bright-orange crackers clearly shaped as goldfish. The Pepperidge Farm Goldfish is slightly shorter and puffier. Some Goldfish have imprinted smiles, others are featureless. Nabisco's goldfish is slightly longer, flatter, and imprinted with an 'X' for eyes and gills. *Compare* Exs. 1 and 2 to Pl.'s Mem. in Opp'n.

If I were to compare Goldfish to the entire CatDog mix, however, the similarity between the marks is somewhat reduced since the CatDog product contains shapes other than goldfish. The presence of the bone and the CatDog may lessen confusion

cartoon is targeted to a 6–12 year old audience. There is no evidence that it depicts obscene, sexual, or illegal activities.

Nor is there any evidence that the CatDog crackers are shoddy. During the evidentiary hearing, Pepperidge Farm's counsel indicated that his client was concerned that children who do not like the taste of the CatDog cracker, but are not sophisticated enough to distinguish CatDog from Goldfish, will demand that their parents never buy the "fish" again. *See* Tr. at 56–59. Although CatDog may have a different taste, this does not automatically mean that it is inferior. Of course, because the product is not available in the marketplace, it is impossible to determine what reaction, either positive or negative, children will have to the taste of the CatDog cracker. Pepperidge Farm has failed to show a likelihood that it will succeed in proving dilution by tarnishment.

between the products in the trademark infringement context, as discussed below. In the dilution context, however, the fact that there are other shapes mixed with the goldfish has little impact. The use by Nabisco of a small goldfish-shaped cheese cracker has a dilutive effect on the ability of a Goldfish cracker to signal Pepperidge Farm as its single source. On balance, because the marks are substantially similar, in that they blur the Goldfish mark as a single source identifier, this factor favors Pepperidge Farm.

### b. Similarity of the Products Covered by the Marks

Under the second Sweet factor, the similarity of the products increases the likelihood of blurring. *See Mead Data,* 875 F.2d at 1036. The language of the FTDA applies both to competitors and noncompetitors.[27] Here, the products—small cheese snack crackers—are identical, weighing in favor of Pepperidge Farm's dilution claim.[28]

### c. Sophistication of Consumers

"Where the plaintiff's consumers are sophisticated, there is a reduced likelihood that a junior mark will blur the senior mark's selling power." *Mead Data,* 875 F.2d at 1036. "Purchasers of relatively inexpensive goods such as ordinary grocery store foods are held to a lesser standard of purchasing care." 3 *McCarthy* at § 23:95. The products at issue here are inexpensively priced snack foods. The retail price for the highest selling package size for Pepperidge Farm Goldfish is approximately $1.79. *See* Callaghan Decl. at ¶ 15. Nabisco estimates that an eight and a half ounce box of CatDog crackers, which prominently features the goldfish cracker on the front, will retail for $1.99. In addition, "[i]f candy or toys are usually bought by children, a lower standard of care may be reasonable." 3 *McCarthy* § 23:98 at 23–191. Here, both parties agree that it is children who are likely to drive the purchasing decision. Because these consumers are held to a lower level of purchasing care, the likelihood of blurring is increased. This factor favors Pepperidge Farm.

### d. Predatory Intent

Predatory intent in this context means that the junior user adopted its mark hoping to benefit commercially from association with the senior mark. *Mead Data,* 875 F.2d at 1037. Under § 43(c) of the Lanham Act, the owner of a famous mark need not show predatory intent to be entitled to injunctive relief, although if it is shown that the defendant "willfully intended to trade on the owner's reputation or to cause dilution of the famous mark, then a party may obtain further relief." 15 U.S.C. §§ 1117(a), 1118. This Court has previously held that predatory intent is not a factor in a determination of whether a party is entitled to injunctive relief under the FTDA. *See Clinique,* 945 F.Supp. at 563 n. 22. Other courts have disagreed and held that predatory intent weighs in favor of a finding of dilution. *See, e.g., Ringling Bros.-Barnum & Bailey Combined Shows, Inc. v. Utah Div.,* 955 F.Supp. 605, 620 (E.D.Va.1997). Although predatory intent, *per se,* is not mentioned in 368–d, New York courts have consistently deemed it a relevant factor in determining the likelihood of dilution. *See, e.g., Roadway Express, Inc. v. Roadway Motor Plazas,* 17 U.S.P.Q.2d, 1131, 1990 WL 120945, *4

**27.** In *I.P. Lund, supra,* the court suggests that a competing mark should have a dilutive effect only in rare cases. Judge Boudin's concurrence in that case suggests the following example of such a rare case: Volkswagen placing a copy of a 1950s Cadillac tail fin on its Beetles. While no consumers would be confused into thinking that the Beetle was a Cadillac, Volkswagen's use of the mark might dilute the strength of the tail fin as Cadillac's trademark.

**28.** The Second Circuit has held that dilution is applicable under New York's anti-dilution statute where the parties are direct competitors. *See Nikon, Inc. v. Ikon Corp.,* 987 F.2d 91, 96 (2d Cir.1993).

(N.D.N.Y.1990); *McDonald's Corp. v. McBagel's, Inc.*, 649 F.Supp. 1268, 1281 (S.D.N.Y.1986); *Toys "R" Us, Inc. v. Canarsie Kiddie Shop, Inc.*, 559 F.Supp. 1189, 1209 (E.D.N.Y.1983). Thus, predatory intent is a factor under the New York anti-dilution statute, under which Pepperidge Farm has also pled a claim. Accordingly, predatory intent remains part of the dilution analysis.

Pepperidge Farm argues that Nabisco's selection of the goldfish shape without much discussion or market research suggests that Nabisco intended to feed off of Goldfish's popularity among children while taking a bite out of Pepperidge Farm's market share. There are several incidents which cause me to conclude that Nabisco's conduct was lacking in good faith.

### 1. Availability of Another Shape

Nabisco asserts that it selected the Cat-Dog, bone and fish shapes in order to tie-in the cartoon's themes, increase the product's sense of fun and reduce breakage during shipment caused by the fragility of the CatDog cracker. *See* Blemleck Decl. at ¶¶ 3, 7, 8. Nickelodeon also licensed the shape of Winslow Oddfellow, a secondary character on the program, for Nabisco's use in manufacturing the product. Nabisco made a Winslow die, but decided not to include Winslow's shape in the mix, ostensibly because "Winslow would not have been a cheese product" like the CatDog (CatDog is orange, Winslow is light blue) and Nabisco would have needed more time to develop the right hue for the Winslow cracker. *See id.* at ¶ 6.

Given the popularity of the cartoon among children, Nabisco had the opportunity to develop a successful snack product tie-in without having to use the fish shape. The CatDog cartoon features many secondary characters, including Winslow, the Greaser Dogs (Cliff, Shriek and Lube), Rancid Rabbit, Mr. Sunshine, Eddie the Squirrel, and Mervis Pantry. *See* Brenner Decl. at Ex. 4. Indeed, Winslow could have been used in the place of the fish: his small size in comparison to the CatDog might have reduced potential breakage. Winslow could have been orange, like the other cheese crackers. As noted earlier, the goldfish is not a character in the show, although it is used as a subtext/motif. Alternatively, Nabisco could have affirmatively avoided confusion between its product and Pepperidge Farm's Goldfish by changing the color of its crackers, using, for example, blue for the bone and green for the fish. Nabisco's failure to seek alternative shapes or colors to distinguish its crackers from Goldfish, and its reserving Winslow in the wings, suggests a lack of good faith.

### 2. Nabisco's Delay in Seeking Preliminary Injunction

Nabisco decided to include the fish cracker in CatDog in August 1998. It does not take a clairvoyant to realize that the fish shape risked diluting or infringing Pepperidge Farm's Goldfish mark. Yet, rather than attempting to resolve any potential trademark claims by seeking a declaratory judgment at that time, Nabisco waited five months until it filed this action on January 4, 1999. In addition, it seems likely that Nabisco would not have sought a declaratory judgment at all without the prompting of Pepperidge Farm's cease-and-desist letter, written soon after Pepperidge Farm learned of the existence of the fish-shaped cracker in the CatDog product. *See* Letter from William Charles Saunders, Associate Counsel, Campbell Soup Company Legal Department, to Steven Hartman, Chief Trademark Counsel for Nabisco, dated December 21, 1998, attached to Complaint at Ex. 3. Nabisco makes no argument that Pepperidge Farm could have learned earlier, but intentionally closed its eyes or was in some way not diligent in protecting its mark. In fact, Nabisco indicates that it did not plan to advertise the CatDog product until its launch in February. *See* McCormick Decl. at ¶¶ 2, 3, 5, 7, 8. An inference may be drawn that Nabisco intentionally kept its

competitor in the dark as to its plans to use a goldfish cracker, so as to eliminate Pepperidge Farm's opportunity to mount an effective challenge to such use.

During the past five months, Nabisco manufactured approximately 5.4 million of the eight and a half ounce boxes of CatDog and contracted for extensive advertising of the product. *See* Testimony of McCormick, Tr. at 195. Nabisco had plenty of opportunity to clarify its rights during this lengthy period of time. Nabisco appeared to delay in order to make it more difficult for Pepperidge Farm to mount an effective legal challenge.

### 3. Assertion of Attorney–Client Privilege

Pepperidge Farm argues that Nabisco acted with less than good faith by failing to heed its counsel's advice. Pepperidge Farm bases this argument on Nabisco's refusal to disclose the advice it received from its trademark counsel in response to its question regarding its proposed use of the goldfish shape. In August 1998, Ms. Brenner sought a legal opinion from Mr. Hartman, Nabisco's Chief Trademark Counsel, regarding the proposed CatDog product, including the shape of the goldfish cracker. *See* Brenner Dep. at 130. Although such opinions are generally given in writing, none was provided. Mr. Hartman does, however, recall giving Ms. Brenner an oral opinion sometime between late October and December. *See* Hartman Dep. at 63–34. During expedited discovery, Pepperidge Farm deposed Ms. Brenner and Mr. Hartman, both of whom asserted the attorney-client privilege when asked about the content of Mr. Hartman's oral opinion.

Pepperidge Farm suggests that a negative inference may be drawn regarding the content of that oral opinion based upon the assertion of the attorney-client privilege. In addition, Pepperidge Farm submits that when counsel gives a client a negative opinion, he or she usually does so orally. In the context of finding willful patent infringement, the Federal Circuit has held that a fact finder may draw an adverse inference from an alleged infringer's assertion of the privilege to shield the advice of counsel. However, this inference may be drawn only if the totality of the evidence supports an inference of bad faith. *See Electro Medical Systems, S.A. v. Cooper Life Sciences, Inc.,* 34 F.3d 1048, 1056 (Fed.Cir.1994); *Fromson v. Western Litho Plate and Supply Co.,* 853 F.2d 1568 (Fed. Cir.1988); *see also Yamanouchi Pharmaceutical v. Danbury Pharmacal,* 21 F.Supp.2d 366, 378 (S.D.N.Y.1998). This reasoning has been extended to trademark infringement claims. *See Zip Dee. Inc. v. Dometic Corp.,* No. 93 C 3200, 1997 WL 323814 (N.D.Ill. June 11, 1997).

Despite its duty to avoid infringing or diluting a senior-user's product, Nabisco selected the goldfish shape as part of its CatDog product. It then sought the advice of its trademark counsel, although it now relies on the attorney-client privilege in refusing to reveal the substance of this opinion. Although Nabisco is entitled to rely on this privilege, it is a fair inference that counsel advised Nabisco that use of the goldfish shape might dilute or infringe Pepperidge Farm's mark. Despite receiving this opinion, Nabisco developed and manufactured the product and filed its declaratory judgement action five months after its decision to use the fish, four weeks before the product launch date, as much as three months after receiving counsel's opinion, and only after prodding by Pepperidge Farm's cease-and-desist letter.

### 4. Discovery Request

Fourth, Nabisco effectively impeded Pepperidge Farm's ability to conduct its own survey on customer confusion by failing to turn over samples of the CatDog product in response to Pepperidge Farm's expedited discovery request. On January 12, 1999, pursuant to this Court's order to proceed with expedited discovery, Pepperidge Farm requested forty boxes of Nabisco's CatDog product, which is not yet

available in the marketplace. *See* First Request for the Production of Documents and Things, attached to Memorandum of Law in Support of Pepperidge Farm's Motion in Limine to Exclude Survey Evidence of Ivan Ross ("Exclusion Mem.") at ¶ 1.

During a court appearance by the parties on the same day, the parties agreed to seek only the discovery each side would "really need" for the Court to consider the preliminary injunction motion. *See* Transcript of January 12, 1999 Hearing, attached to Swire Decl., Ex. 3 at 25. Nabisco's counsel claims that neither during that hearing or afterwards during extensive discovery discussions between the parties did Pepperidge Farm's counsel ever reiterate his request for the forty specimens of the CatDog product. *See* Supplemental Declaration of James Swire, dated January 24, 1999 ("Swire Supp. Decl.") at ¶¶ 3, 4. However, in a January 15 letter, Pepperidge Farm reiterated its discovery request for Nabisco's production of "any other requested category." Letter from Ethan Horwitz, Esq. to Bruce Ewing, Esq., dated January 15, 1999, attached to Exclusion Mem. at Ex. B.

Other than one sample of the CatDog product that Pepperidge Farm located in a Washington State grocery store (due to accidental premature shelving), Nabisco was in sole possession and complete control of the product. Nabisco clearly understood the value to this proceeding of a survey on the likelihood of confusion and, in fact, commissioned Dr. Ivan Ross to conduct Nabisco's own survey. Given this understanding and Nabisco's indifference to Pepperidge Farm's need to conduct a similar study, I infer that Nabisco may have intended to 'corner' the survey evidence.

Based on the totality of these circumstances, I conclude that Nabisco did not act in good faith in using the goldfish shape in its CatDog product. This factor weighs in Pepperidge Farm's favor.

### e. Renown of the Senior Mark

As discussed above, I have already determined that the Goldfish mark is famous. This factor favors Pepperidge Farm.

### f. Renown of the Junior Mark

Blurring is more likely if the junior user has a strong, independent image and reputation for its mark. Here, the junior mark must be Nabisco's entire CatDog product. This mark is likely to achieve great renown, increasing the likelihood of blurring in consumers' minds. The Nickelodeon cartoon has national fame among 6–12 year-olds, achieving a 3.9 Nielsen rating in the brief three months of its existence (the leading children's television show, Rugrats, has a 4.4 rating). *See* Brenner Decl. at ¶ 5. In addition, Nickelodeon has launched a $10 million advertising campaign with CatDog-themed product tie-ins and a large merchandising campaign. *See id.* This factor favors Pepperidge Farm.

### g. Conclusion

Upon considering the Sweet factors in their totality, I conclude that Pepperidge Farm has shown a likelihood of success on its claim that Nabisco's use of a goldfish cracker in CatDog will result in a blurring of its famous Goldfish mark. All of the factors favor Pepperidge Farm. As discussed earlier, in the cheese snack cracker market, Pepperidge Farm has centered its marketing and promotional efforts around Goldfish, and it has spent considerable amounts of money maintaining the image of the Goldfish cracker and strengthening the ties between the product and Pepperidge Farm. In essence, Pepperidge Farm has taken a unique and fanciful idea—creating a cheese cracker in the shape of a goldfish—and turned this idea into its signature. Nabisco's inclusion of this signature element as part of the CatDog product strikes at the heart of what dilution law is intended to prevent: the "gradual diminution or whittling away of the value of the famous mark by blurring uses by others." 3 *McCarthy* § 24:94 at 24–161.

Over time, the presence of Nabisco's goldfish-shaped cracker within the CatDog mix is likely to weaken the focus of consumers on the true source of the Goldfish. *See Liquid Glass Enterprises, Inc. v. Dr. Ing. h.c.F. Porsche AG*, 8 F.Supp.2d 398 (D.N.J.1998) (use of Porsche trademark and trade dress in car polish advertisement likely to cause dilution under FTDA); *Sara Lee Corp. v. American Leather Products, Inc.*, 97 Civ. 4158, 1998 WL 433764 (N.D.Ill. July 29, 1998) (use of similar hang tag on handbags constitutes dilution of trade dress under FTDA); *Clinique Laboratories, Inc. v. Dep Corp.*, 945 F.Supp. 547 (S.D.N.Y.1996) (dilution of trademark and trade dress under FTDA and New York statute).

■ Pepperidge Farm has demonstrated a likelihood of success on the merits of its claims under the FTDA and the New York Anti-Dilution statute. A showing of a likelihood of dilution will automatically establish irreparable harm. *See Deere*, 860 F.Supp. at 122. Thus, Nabisco must be preliminarily enjoined from marketing its CatDog product in its present form.

## VII. Pepperidge Farm's Trademark Infringement Claim

■ Because I have already found that Pepperidge Farm has shown a likelihood of success on the merits of its dilution claim, I shall only address the trademark infringement claim in the most cursory fashion. To prevail on a trademark infringement claim under § 43(a), a party must show: (1) that it has a valid mark subject to protection; and (2) that an allegedly infringing mark and/or dress results in a likelihood of confusion. *See Gruner + Jahr USA Pub. v. Meredith Corp.*, 991 F.2d 1072, 1074 (2d Cir.1993); *Yarmuth–Dion, Inc. v. D'ion Furs, Inc.*, 835 F.2d 990, 992–93 (2d Cir.1987); *Corning Glass Works v. Jeannette Glass Co.*,

308 F.Supp. 1321, 1325 (S.D.N.Y.), *aff'd*, 432 F.2d 784 (2d Cir.1970).

■ There is no doubt that Pepperidge Farm satisfies the first element—it has a valid mark. The key inquiry, then, is whether the allegedly infringing mark results in a likelihood of confusion. Typically, the inquiry into likelihood of confusion is structured by reference to the nonexclusive list of eight factors set forth in *Polaroid v. Polarad Electronics Corp.*, 287 F.2d 492 (2d Cir.1961) (Friendly, J.). These factors, while well known; are always worth repeating: (1) the strength of the senior mark; (2) the degree of similarity between the two marks; (3) the competitive proximity of the products or services; (4) the existence of actual confusion; (5) the likelihood that the senior user will "bridge the gap" between the two markets; (6) the junior user's good faith in adopting the mark; (7) the quality of the junior user's product; and (8) the sophistication of purchasers.

■ There is no doubt that Pepperidge Farm's Goldfish mark is very strong, that the two marks compete in the identical market, that there is no gap to bridge, that Nabisco acted with something less than good faith, that the quality of the two products is similar and that the consumers are relatively unsophisticated. All of these factors weigh in favor of Pepperidge Farm.

■ The remaining two factors, actual confusion and similarity of the marks, are problematic for Pepperidge Farm. Actual confusion may be shown by specific incidents of confusion among consumers or by a market survey. *See Home Shopping Club, Inc. v. Charles of the Ritz Group, Inc.*, 820 F.Supp. 763, 774 (S.D.N.Y.1993). At this early stage, Pepperidge Farm is unable to offer proof of either. While it may eventually be able to do so as this case matures, it cannot do so now. This factor, then, cannot cut in its favor.[29]

---

29. Nabisco, in fact, presented a survey demonstrating that there was no consumer confusion based on the fish shape in CatDog. This survey was very flawed, in that it did not focus on the relevant "universe." It does,

The most difficult of all, however, is the similarity of the marks. While I have already found that the marks are substantially similar with respect to the dilution analysis, that discussion focused on the use of the goldfish in the Nabisco product and concluded that this use blurred Pepperidge Farm's famous Goldfish mark. The infringement inquiry is quite different. The question here is whether the marks are so similar that a consumer is likely to be confused into thinking that Pepperidge Farm makes the CatDog product.

In determining whether there is consumer confusion, the test is whether the products create the same overall general impression. *See Harold F. Ritchie, Inc. v. Chesebrough–Pond's, Inc.*, 281 F.2d 755, 762 (2d Cir.1960). I turn to the rather simple approach suggested by a leading commentator: "Similarity of appearance between marks is really nothing more than a subjective 'eyeball' test." 3 *McCarthy* § 23:25 at 23–58.3. While a visual comparison of the Pepperidge Farm Goldfish and the Nabisco goldfish convinces me that there would be a likelihood of confusion between these two images, that is not the relevant inquiry. Here, the proper comparison is between the Pepperidge Farm Goldfish and the CatDog product because I must determine whether a consumer eating CatDog will be confused into thinking that it is a Pepperidge Farm product. As noted, the goldfish make up only 25% of that product.

Pepperidge Farm has failed to make a "clear showing" of likelihood of success on the merits of the infringement claim, because, at this early stage of the litigation it has failed to show a likelihood that its target consumers, children in the 6–12 year-old age group, will be confused by the Nabisco product. The CatDog product is a three-shape mix, made up primarily of the lead cartoon character, the CatDog. The Goldfish, of course, is made up solely of Goldfish.[30] As the leading treatise says, "[r]egarding visual similarity, all one can say is 'I know it when I see it.'" *Id.* at 23–58.4. These products are just not visually similar.

In addition, it is unclear how children will eat CatDog, namely, whether they will eat the crackers out of or in close proximity to the box, with prominently displays the CatDog, Cheese Nips, Nabisco and Nickelodeon trademarks. In fact, Nabisco has designed the CatDog box to be retained by children by including a contest entry form and CatDog game board and game pieces on the interior of the box, suggesting a decreased likelihood of confusion.

It is well accepted that a court's evaluation of the *Polaroid* factors should not be mechanical, nor is any single factor determinative. *See Plus Products v. Plus Discount Foods, Inc.*, 722 F.2d 999, 1004 (2d Cir.1983). Using my "own eyes" and "imagination [of] any possible confusion to which a careless buyer might be subject," *Caron Corp. v. V. Vivaudou*, 4 F.2d 995 (2d Cir.1925) (Learned Hand, J.), I conclude that at this early stage Pepperidge Farm has not shown a likelihood of confusion. Thus a preliminary injunction is not warranted on its trademark infringement claim.

■ Of course, likelihood of success on the merits is not the end of the inquiry. In the alternative, Pepperidge Farm may show sufficiently serious questions going to the merits and a balance of the hardships tipping decidedly in its favor. *See Jackson Dairy*, 596 F.2d at 72. Pepperidge Farm cannot show that the balance of

---

however, suggest that confusion may be difficult to prove.

**30.** Even though consumers may be accustomed to seeing Pepperidge Farm's Goldfish in a mix of other pretzels and snacks, these mixes are not Pepperidge Farm's "mark." In addition, a comparison of the two mixes demonstrates that they are quite distinct, as the Nabisco mix is made up of small gold objects, while the Pepperidge Farm mix has different colors, flavors, and shapes, including pretzels and sticks.

hardships tips in its favor. Rather, it is Nabisco which is likely to sustain hardship by the entry of a preliminary injunction, having produced $3.4 million of CatDog and contracted with advertisers for television and print promotions and with retail customers for shipment and shelf space. *See* McCormick Decl. at ¶¶ 6–11.

## VIII. Pepperidge Farm's New York State Unfair Competition Claim

■ New York's law of unfair competition may provide yet a third avenue of relief.[31] "The essence of unfair competition under New York common law is the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the goods." *Jeffrey Milstein* 58 F.3d at 34 (quoting *Rosenfeld v. W.B. Saunders*, 728 F.Supp. 236, 249–50 (S.D.N.Y.), *aff'd*, 923 F.2d 845 (2d Cir. 1990)) (internal quotation omitted). "Likelihood of confusion is judged in an unfair competition claim in the same manner as a Lanham Act claim." *Tough Traveler, Ltd. v. Outbound Prods.*, 989 F.Supp. 203, 217 (N.D.N.Y.1997), *aff'd*, 165 F.3d 15, 1998 WL 743725 (2d Cir.1998) (citations omitted); *Castle Rock Entertainment v. Carol Publishing Group, Inc.*, 955 F.Supp. 260, 272 (S.D.N.Y.1997), *aff'd*, 150 F.3d 132 (2d Cir.1998) (citations omitted). Because I have concluded that at this preliminary stage Pepperidge Farm has not made a "clear showing" that the Goldfish and the CatDog are confusingly similar, Pepperidge Farm has not demonstrated a likelihood of success on this claim. As found in the discussion of Pepperidge Farm's trademark infringement claim, the balance of hardships does not tip decidedly in its favor.

## IX. Conclusion

For the foregoing reasons, Pepperidge Farm's motion for a preliminary injunction is granted. Nabisco has offered compelling proof of the damages it will sustain if the Court enjoins the launch of CatDog. Accordingly, Pepperidge Farm must post a bond in the amount of $3.55 million ($3.4 million for the currently existing CatDog products and $150,000—the amount Nabisco has spent developing the CatDog television commercial). Nabisco is ordered to: (1) recall all CatDog brand products currently distributed to any retailer; and (2) cease using the Goldfish mark (i.e. a *gold* goldfish) in connection with the manufacture, distribution, sale, advertisement or promotion of any of its products.

---

**31.** This claim is not preempted by the Lanham Act. As the Second Circuit recently instructed, "[t]o decide whether a state law claim is preempted, this Court employs the 'extra element' test" meaning that the "extra element must change the 'nature of the action so that it is qualitatively different from a [Lanham Act] claim.'" *Samara*, at 130–31 (quoting *Mayer v. Josiah Wedgwood & Sons, Ltd.*, 601 F.Supp. 1523, 1535 (S.D.N.Y.1985)). This extra element test is satisfied given that there must be "some element of bad faith" in an unfair competition claim. *815 Tonawanda Street Corp. v. Fay's Drug Co., Inc.*, 842 F.2d 643, 649 (2d Cir.1988). Accordingly, preemption is not an issue.